**STATE of Missouri, Respondent,**

v.

**Ulaska JACKSON, Jr., Appellant.**

**No. 58025.**

Supreme Court of Missouri, Division No. 2.

March 11, 1974.

John C. Danforth, Atty. Gen., Neil Mac-Farlane, Assist. Atty. Gen., Jefferson City, for respondent.

Martin Anderson, Kansas City, for appellant.

HENRY I. EAGER, Special Commissioner.

Defendant was convicted of first degree murder and, pursuant to the jury verdict, he was sentenced to life imprisonment. We have jurisdiction under our in Banc order of April 9, 1973, since the notice of appeal was filed on July 11, 1972. The defendant does not contest the sufficiency of the evidence, and in fact admits the shooting. We need not state the facts in great detail.

The case arises out of an armed robbery at the El Cabana Motel in Blue Parkway in Jackson County, in which William LacKamp was shot and killed. Shortly before 2:00 a. m. on December 11, 1971, two armed Negroes entered the place; defendant was concededly one of them. He proceeded to the desk and started to register; very shortly another, identified as one Tinsley, ran in and went immediately into the adjoining living quarters where Mr. Lac-Kamp was asleep on a divan. At that point defendant pulled a pistol, a .39 mm Luger, on Mrs. LacKamp at the desk and told her not to move or he would kill her. The other intruder was armed with a shotgun, which he held on the reclining Lac-Kamp. Mrs. LacKamp screamed and ran into that room. Thereafter, much action occurred which we need not detail in full. The jury could well have found: that on demand the LacKamps gave Tinsley what money they had on their persons, that Tinsley searched and found a metal box containing approximately $2,500 which he took, that both were threatened and confronted with one or both guns, that Mrs. LacKamp was struck and knocked down at least twice, with a fist or fists and with the shotgun; further, that Tinsley tried to jerk the telephone cord loose, that a bell rang indicating that someone was coming in, and that the men started to leave; that Tinsley ran out into the lobby first, followed in a matter of seconds by defendant; that LacKamp then got up from a sitting position on the divan to shut the door leading into the lobby or office; that Mrs. LacKamp was sitting in a chair in the living quarters where the robbers had made her sit; that as LacKamp was attempting to close the door he was shot, the bullet being a .39 mm copper-jacketed one such as would come from the gun defendant was carrying. Mrs. LacKamp did not actually see the person shoot Mr. LacKamp because of her position. No one had entered the office or motel at the time except the two intruders. LacKamp fell to the floor in such a position that his feet held the door almost shut. The robbers ran out, could not start their car, and forced a couple who had stopped in front of the motel to drive them away. Mr. LacKamp died very shortly after he was shot; the bullet entered his upper left abdomen and ranged down to the extreme lower right. A large artery had been severed. The bullet was recovered and also a spent shell; these

were received in evidence, but the gun was never found. Mrs. LacKamp positively identified defendant as one of the robbers, being the one who carried the Luger pistol.

About four days after the slaying defendant's parents brought him to the police station where, in their presence, a rather detailed statement was taken and signed by the defendant. The appropriate warnings were taken. The statement was read into evidence at the trial with no objection and there is no point made here regarding its admission. Defendant testified at the trial; he was 17 years of age. The gist of his statement and testimony was: that he was forced to participate in this robbery by Tinsley who threatened to kill him if he did not do so; that Tinsley and one Whitley (who had worked for LacKamp and had been in his motel) planned the robbery in his presence over a matter of several hours; that he was furnished the pistol and told that he would have to kill LacKamp, or Tinsley would kill him, the reason being that LacKamp might "identify" Whitley with the robbery; that defendant did not try to run away, but went along and participated in the robbery, holding his gun on the victims; that Tinsley struck Mrs. LacKamp and knocked her down, and they also "tussled" over the shotgun; that finally he struck her with the gun and she fell again; that Mr. LacKamp started to get up from the divan while defendant was holding his pistol on him; Tinsley told defendant to shoot him and, from his position in the doorway, he shot at LacKamp, aiming at his legs while LacKamp was in a crouched position. Defendant gave more details of the escape and said he stayed with friends for three or four days before giving himself up; he stated that he got none of the money, and that he was scared of what Tinsley might do to him. It thus appears that defendant admitted that he shot LacKamp, claimed that he was forced to do so by Tinsley, and claimed further that he did not intend to kill him. It would seem that the jury rejected these last two claims.

The principal instruction submitted first degree murder on a felony-murder theory, with a choice to the jury of the death penalty or life imprisonment. The jury panel had been qualified for the imposition of the death penalty. It imposed a life sentence. It is perhaps significant that, during its deliberations, the jury asked the Court whether it was possible to impose a life sentence "with no parole." The Court told them that this was "out of your hands." The jury deliberated for several hours, returning, as stated, a verdict of guilty with a life sentence. A timely motion for new trial was filed, raising the two points which are presented here.

█ The first point made by the appellant is that the Court erred in permitting the State to qualify the jury for the imposition of the death penalty resulting in the excusing of 13 (or more) veniremen for cause. Defendant says that this released those veniremen who would have been more sympathetic to the defendant, and that had they remained, there *could* have been a hung jury or an acquittal; that as a result he did not have a truly impartial jury. Before going further, we note that the contention is highly speculative. The State asserts that defendant did not properly raise this point because the first objection was made at the swearing of the jury. We prefer to consider it on the merits.

The case was tried from May 3, 1972 to May 5, 1972, inclusive. The various opinions in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, were handed down on June 29, 1972. In that case, by a 5–4 vote, the death penalty, as then regulated and imposed in three states, was held to be impermissible under the Constitution. At the time this case was tried statutes permitting the imposition of the death penalty had *not* been declared unconstitutional. In fact, the cases of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968) and Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed. 2d 797 (1968), laid down the proper proce-

dure for qualifying a jury for consideration of the death penalty. This was, essentially, that a juryman to be disqualified must be one who refuses to even consider the death penalty and one who would not vote to impose it under any facts and circumstances. We have examined the lengthy voir dire of the panel in the present case; those who were peremptorily excused from the panel were questioned and challenged after being specifically interrogated on that basis. Defendant does not contend otherwise. The death penalty was legal and permissible at the time of this trial, the jury was properly qualified and the Court would have been remiss if it had not permitted such a qualification. The case of Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), cited by defendant, merely reiterates the requirements of a proper interrogation of the panel, as stated in Witherspoon.

It is a little difficult to appreciate defendant's position. In effect, counsel says that the prosecution and the Court should have anticipated the Supreme Court's ruling in Furman and refrained from all interrogation concerning the death penalty. The State did not waive the death penalty and the Court could not have refused to let the jury be so qualified; nor could it fail to instruct on the death penalty, as it did. There was no error in any part of this procedure. Cases are tried under the law as it then exists, United States ex rel. Fein v. Deegan, 410 F.2d 13 (CA 2, 1968); neither counsel nor the Court is required to speculate or prophesy on what the Supreme Court may do thereafter. And this is true regardless of the arguments now presented that the death penalty is and was "morally unacceptable" and that it is "shocking to the conscience."

■ Counsel says that defendant was thus deprived of a jury of his "peers." This is a mere repetition in different wording of the previous argument and it is of no legal effect for the reasons already stated. Moreover, the Constitutions, federal and state, only require an "impartial" jury and say nothing about one's "peers."

Shaw v. United States, 403 F.2d 528 (CA 8, 1968).

■ For a wholly independent reason the point attacking the jury qualification is invalid and is denied. Any possible prejudice from the qualification of a panel for the death penalty and the supposed errors therein apply only where the jury has imposed the death penalty. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed. 2d 797 (1968). In those cases it was held that even an improper qualification of the jury on the death penalty did not require a reversal where the jury had imposed a *life* sentence, and that the disqualification of those persons who opposed the death penalty did not render the remaining jury partial or prejudiced on the issue of guilt, or substantially increase the risk of conviction. Our own Court had held very recently that the exclusion of prospective jurors in qualifying the panel for the death penalty did not render the jury partial or prosecution prone when in fact a life sentence had been imposed. Ginnings v. State, 506 S.W.2d 422 (Mo.1974); State v. Haynes, 482 S.W.2d 444 (Mo.1972); State v. Bowens, 476 S.W.2d 495 (Mo.1972); State v. Adams, 497 S.W.2d 147 (Mo. 1973). In rejecting the death penalty here the jury imposed the only punishment permissible under our statute, life imprisonment. The point has been completely answered by these cases. Defendant's bare references to "due process" are meaningless here.

■ Defendant's remaining point is that the Court erred in not declaring a mistrial when the wife of the deceased made an unsolicited and prejudicial statement in the presence of the jury. She had testified at some length about the occurrences involved and had gotten to the point in her narrative where one of the men had picked up a bunch of keys, opened the strong box, stuffed the money in his shirt and the bell rang; the record indicates that she had been crying. At this point she exclaimed "Oh God! Why did you kill him? You

didn't have to kill him!" An immediate recess was requested, the witness volunteered that she was sorry, and it being nearly time for adjournment, the jury was sent to its hotel for the night, with an appropriate general caution. Counsel and the Court then discussed the matter. Counsel for defendant expressed a "wish" that there was some way in which the jury could be instructed to disregard what Mrs. LacKamp had said, and the Court suggested that such an instruction might "highlight it," but told counsel that it would do what he might ask; upon further hesitation of counsel, the Court told him to think it over until morning, to write out what he believed the Court should say, and that he would give it unless it "shocks my conscience." Upon reconvening the next morning counsel stated that he had concluded that any such admonition would not correct the situation, that the impression received by the jury was "irrevocable," both in what she said and how she said it, and that he therefore asked for a mistrial. This motion was overruled and the trial proceeded, without further incident.

Defendant cites several cases as supposedly holding that the prejudicial effect of sundry statements and acts could only be removed by granting a mistrial. State v. Craig, 433 S.W.2d 811 (Mo.1968); State v. Hepperman, 349 Mo. 681, 162 S.W.2d 878 (1942); State v. Benson, 346 Mo. 497, 142 S.W.2d 52 (1940). In Craig, supra, this Court affirmed the action of the trial court in refusing to grant a mistrial where a police officer referred to the "hold up man" and the "victims." The Court had instructed the jury to disregard the expressions and told the witness not to use them again. In affirming, this Court recognized the general principle that in some situations the testimony or occurrence may be such that its prejudicial effect cannot be removed by an instruction, but said that the granting of a mistrial is a drastic remedy to be exercised only in extraordinary circumstances and "where the incident is so grievous that the prejudicial effect can be removed in no other way," citing State v. Camper, 391 S.W.2d 926 (Mo.1965). It further recognized that the granting of such a motion rests largely in the discretion of the trial court and that an appellate court simply determines whether the trial court abused its discretion. Hepperman, supra, adds nothing to these observations. In Benson, supra, the effect of certain hearsay evidence controverting a portion of the principal defense was held not to have been removed by an instruction to disregard it. Counsel concedes here that merely crying before the jury would not be so prejudicial as to require a mistrial, citing Walton v. United States Steel Corp., 362 S.W.2d 617 (Mo.1962), but insists that Mrs. LacKamp's statement and the manner of making it prevented defendant from receiving a fair and impartial trial.

It would be useless to review the sundry cases cited by the State. They are generally "follow-ups" of State v. Camper, 391 S.W.2d 926 (Mo.1965) and State v. James, 347 S.W.2d 211 (Mo.1961). They recognize fully the principles just stated. Some involved evidence or statements supposedly creating an admission or inference of guilt, some a prior arrest or conviction. These cases emphasize the discretion resting in the trial court. There is, of course, no case precisely in point on our facts.

We have concluded that the able and experienced trial court did not abuse its discretion in denying a mistrial. It offered to do whatever else counsel might request. The gist of Mrs. LacKamp's statement was that the killing was unnecessary. In exercising its discretion the trial court may well have been influenced by the following facts and developments. The fact that the killing *was* unnecessary was obvious to any jury which had heard the evidence. Defendant had admitted the shooting and the very unusual circumstances. During the voir dire, one member of the panel stated that he had heard about the crime on the radio and thought "at the time it was an unnecessary thing." The other members of the panel heard this. The statement of Mrs. LacKamp was the type of thing which may occasionally occur in a murder trial or one for some other serious crime.

Neither the Court nor counsel can completely control the witnesses under all circumstances. It is not claimed here that the prosecution was in any way at fault. If the case were retried, something similar, or worse, might again occur. Defendant's own conduct, as admitted by him, was the thing which was most likely to produce such a statement from the agitated widow.

The jury gave defendant the lesser of the only two punishments that it could impose. Nothing is to be gained by further discussion. The Court did not abuse its discretion.

We find no reversible error and the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.