STATE of Missouri, Respondent,

v.

Walter Richard OLINGHOUSE,
Appellant.

No. 61216.

Supreme Court of Missouri,
En Banc.

May 13, 1980.

Rehearing Denied June 10, 1980.

David E. Wilhite, Lebanon, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, III, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT R. WELBORN, Special Judge.

Appeal from judgment of conviction of capital murder, with a sentence of life imprisonment without possibility of parole for 50 years, entered upon jury verdict.

On Sunday evening, May 15, 1977, four men, appellant Walter Richard Olinghouse, David Dewaine Thomas, Danny Thomas and Richard Johnson were driving around in Hickory County. All four were armed. A robbery of the Fraziers was discussed. For several years, Olinghouse and his parents had lived on a farm adjoining the Frazier farm, between Stockton and Humansville. The Olinghouses had moved from their farm several years previously, but appellant had been at the Frazier house on numerous occasions before they moved. He told his companions that the Fraziers kept lots of money at their house.

The men drove to the vicinity of the Frazier farm. Johnson and Dewaine Thomas walked to the house, carrying a plastic milk jug. When Mr. Frazier answered their pounding at the door, they said they were out of gasoline and asked whether he could supply them with some. Frazier went outside and filled the plastic container with gasoline from a tank. As the three returned toward the house, Thomas and Johnson pulled their guns and announced a hold-up. Frazier asked his wife to let them back in the house, saying that the men had guns. She opened the door and the men came in and threw Mr. Frazier to the kitchen floor. Mrs. Frazier had a .22 pistol in her hands but she did not know how to use it and it was taken from her.

Mrs. Frazier was bound, gagged and blindfolded. The men demanded to know where the money was and were told of small caches in various places, amounting to a few hundred dollars. Mr. Frazier gave them his billfold. He too was bound and blindfolded.

After Mr. Frazier had been blindfolded, the back porch light was flashed as a signal and the other two men drove up to the house and entered. Demands of Frazier were accented by a blow to the head with the butt of a M–16 rifle and kicks to the body by all four men.

The house was thoroughly ransacked during the two hours or so that the intruders were there. They took the money they found, jewelry, silverware, a gun collection and other items.

Near the end of the foray one of the four called: "Hey, Wickie, come and look at this." Olinghouse was known by the nickname "Wickie" and the remark was made near where Mr. Frazier was lying on the floor.

Appellant feared that Frazier would recognize him from the use of his nickname. Frazier said that he hadn't heard anything but the men were not convinced and concluded that Frazier would be killed.

The loot was removed and Frazier, bound and blindfolded, was shoved into the rear of his automobile, parked near the house.

Dewaine and appellant got in the Frazier auto and Danny and Johnson got into the Johnson Chevrolet in which they had driven to the farm.

The two automobiles were driven to the Caplinger Bottoms of the Sac River, in the vicinity of Caplinger Mills. Frazier was carried from the car and placed in an area of an old camp fire. The gasoline he had given the men was poured on him. Dewaine shot Frazier in the back twice with a sawed off 20–gauge shotgun. Johnson shot Frazier with a .32 caliber pistol and Olinghouse shot him with a .38. Danny Thomas fired three to five shots at Frazier. Danny then threw a match toward Frazier and the gasoline ignited.

Johnson and Dewaine drove to Dewaine's house in Gerster. Danny and Olinghouse joined them there shortly and the loot from the robbery was removed from the automobiles.

Sometime after the robbers left, Mrs. Frazier freed herself and went to a neighbor's and the sheriff was called. He

reached the Frazier house at around 4:00 A.M. A search for Mr. Frazier and the Frazier auto was begun. At around 4:00 P.M., May 16, the Frazier automobile was discovered in the vicinity of Gerster.

Johnson, appellant and Danny had entered Floyd Weaver's house in Gerster early on the morning of May 16. Weaver, Johnson's cousin, was not at home. Entry was gained through a window.

Johnson left the area at around 11:00 A.M., May 17, to accompany his mother on a trip to Kentucky. Shortly thereafter, a relative of Johnson's told officers that some of the persons involved in the Frazier robbery were at the Weaver house. At around 2:00 P.M., a number of officers surrounded the house and called for the occupants to come out. When they failed to do so, tear gas was used and appellant and Danny emerged and were placed under arrest.

The FBI had been called into the case. Appellant was taken to Springfield and interrogated by FBI agents and state troopers. He eventually made a statement, admitting his participation in the crime and leading officers to the discovery of Frazier's body.

An *information charging* Olinghouse with capital murder was filed in the Cedar County Circuit Court. The case was taken on change of venue to Laclede County. A jury trial there resulted in a verdict of guilty of capital murder.

## I

### Motions to Dismiss Information

Appellant assigns as error the trial court's overruling of several motions seeking dismissal of the information upon which he was tried. He moved to dismiss the information on the grounds that he was denied the right to a fair preliminary hearing because the magistrate who conducted the hearing refused to require state's witnesses to divulge the identity of the person who provided the information which led to the location and arrest of appellant. Appellant also complains that he was not permitted to cross-examine witnesses regarding the "confidential informant." He complains that the failure to disclose the identity of the confidential informant deprived him of a fair preliminary hearing, in violation of due process requirements of the federal and state constitutions, and that the restriction of his cross-examination of the witness on this matter denied him the right to confront witnesses against him as guaranteed by state and federal constitutions.

At the preliminary hearing, Sergeant Selvey of the Missouri State Highway Patrol testified that, on May 18, he was working on the Frazier case and that a "confidential informant" told him that Johnson, Thomas and appellant were involved in the Frazier case, that Frazier had been shot and that the three men could be found in the Weaver house in Gerster. Defense counsel objected to testimony about what the "confidential informant" had told the witness and objected further when he was prevented from cross-examining the witness regarding the identity of the "confidential informant."

■ Assuming, without deciding, that this is such a matter as would invalidate a preliminary hearing, appellant was entitled to no relief on this ground. Under the rule laid down in *State v. Wandix*, 590 S.W.2d 82, 85[3] (Mo. banc 1979), the informant in this case was not in a position to offer testimony relevant and crucial to the defense and therefore the state could withhold her identity.

It may be noted that the informer was identified well before the trial of the case and no question of protecting her identity arose then.

Appellant's motion to dismiss the information on the grounds that he was arrested without a warrant was overruled by the trial court. That ruling is assigned as error. Appellant argues that there was ample time to have obtained a warrant for his arrest after the officers were informed of his whereabouts and that his warrantless arrest in such circumstances violated his rights under the Fourth Amendment to the Constitution of the United States. He also contends that his arrest was without proba-

ble cause in that it was based upon information supplied by a confidential informant whose reliability was unknown to the arresting officers.

 The argument on these points overlooks the rule that "[a]n illegal arrest does not divest the trial court of jurisdiction to try the case. *Watson v. State*, 475 S.W.2d 8, 12 (Mo.1972)." *State v. Moore*, 580 S.W.2d 747, 749[1, 2] (Mo. banc 1979). In any event, as noted below, the trial court found appellant's arrest valid.

 Appellant's motion to dismiss the information because of matters going to the validity of Section 559.011, RSMo 1975 Supp., fixing the punishment for the crime of capital murder, was overruled by the trial court. He renews those complaints here, first contending that S.C.S.H.C.S.H.B. 150 of the First Regular Session of the 78th General Assembly (Laws of Mo., 1975–1976, p. 408) which included Section 559.011 was enacted in violation of Section 23 of Article III, Constitution of Missouri, in that the bill related to more than one subject. The subject of the bill, as disclosed by the title, was " * * * certain crimes and the punishment therefor * * *." The bill contained thirteen sections and appellant's complaint is directed at the inclusion in the bill of an amendment to Section 549.060, RSMo 1969, relating to judicial parole and probation. The effect of the amendment of that section was to exclude from judicial parole persons sentenced under the capital murder provisions of the bill to life imprisonment, without eligibility for parole for 50 years. If there were merit to the appellant's complaint, its acceptance would merely nullify the purported amendment of Section 549.061 for failure of the subject thereof to be disclosed by the title. *State ex rel. Taylor v. Wade*, 360 Mo. 895, 231 S.W.2d 179, 184[13–15] (banc 1950); *State ex rel. Normandy School Dist. v. Small*, 356 S.W.2d 864, 867–871[1] (Mo. banc 1962). Such result would not affect the validity of the information.

 Appellant also contends that the above enactment was violative of Section 28

of Article III, Constitution of Missouri, in that the limitation upon parole in the event of a life sentence for capital murder had the effect of amending Section 549.261, RSMo 1969, pertaining to the State Board of Probation and Parole, but that that section, as amended, was not set forth in the bill. Amendments by implication are not subject to the constitutional limitation here invoked. *State ex rel. McNary v. Stussie*, 518 S.W.2d 630, 635[2] (Mo. banc 1974).

 Finally, to dispose of all of appellant's constitutional attacks on Section 559.011, he contends that the mandatory sentence of life imprisonment without possibility of parole for 50 years constitutes cruel and unusual punishment in violation of federal and state constitutional guaranties and due process requirements and because the statute denies the right to have the court grant probation under any circumstances or to have a jury exercise their discretion as to whether or not the crime warrants such harsh treatment.

Appellant offers little in the way of authority supporting his contentions. He requests consideration of the views of Judge McMillian in his dissent in *State v. Motley*, 546 S.W.2d 435, 439–441 (Mo.App.1976), asserting that a court has inherent authority to determine whether an incarceration in a particular case is an appropriate punishment. Appellant also cites *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), as a pronouncement by the United States Supreme Court in favor of discretion on the part of the jury in sentencing.

A well–reasoned answer to the contention of appellant is found in *State v. Farrow*, 118 N.H. 296, 386 A.2d 808 (1978). In that case, the court stated:

"The defendants also claim that life imprisonment without possibility of parole is cruel and unusual punishment. Although the Supreme Court has considered the meaning of 'cruel and unusual' on numerous occasions, it has yet to promulgate one all–inclusive test that a majority of the Justices have sanctioned for measuring all penalties. How-

ever, a reading of these opinions discloses some criteria for testing any sentence. Punishment must not be disproportionate to the crime for which it is imposed. *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 2865, 53 L.Ed.2d 982 (1977); *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, [2931,] 49 L.Ed.2d 859 (1976). It must be acceptable according to contemporary standards and comport with basic notions of human dignity. *Gregg v. Georgia*, supra at 182, 96 S.Ct. 2909 [at 2929]; *Trop v. Dulles*, 356 U.S. 86, 100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

"Finally, at least with regard to death sentences, the punishment must not be imposed arbitrarily and must be administered in a statistically significant number of similar cases. *Gregg v. Georgia*, supra, 428 U.S. at 188, 96 S.Ct. 2909 [at 2932,]; see *Woodson v. North Carolina*, supra, 428 U.S. at 302, 96 S.Ct. 2978 [at 2990]. The finder of fact must be given objective standards for imposing a death sentence but must retain some discretion to choose a lesser punishment based on particularized facts. *Roberts v. Louisiana supra; Woodson v. North Carolina*, supra. However the applicability of the arbitrariness test, in whole or in part, to crimes other than those for which death is prescribable is uncertain. See *Woodson v. North Carolina*, supra at 302–05, 96 S.Ct. 2978 [at 2990–2991]; *Gregg v. Georgia*, supra, 428 U.S. at 188–89, 96 S.Ct. 2909 [at 2932].

"Measuring the sentence of life imprisonment without parole against the purposes society has in punishing crime, we find nothing per se disproportionate in these sentences for first–degree murder. RSA 630:1–a II (Supp.1977) requires that the defendant consciously, deliberately and premeditatively cause the death of his victim in order for the State to exact such a punishment. Surely under the retribution rationale, which remains a societal goal, *Gregg v. Georgia*, supra at 183–84, 96 S.Ct. 2909 [at 2929–2930], the State could exact the death penalty for such a crime. Id. Thus with regard solely to proportionality, a life sentence with-

out parole is acceptable a fortiori in these cases. The State could also conclude that a person who acts in the manner proscribed by the statute is incapable of rehabilitation and must be isolated from society for the remainder of his life.

"The defendants argue most strongly that even if paroleless life sentences satisfy contemporary standards of penology, they do not comport with basic notions of human dignity. That argument derives from *Trop v. Dulles* supra, in which the Supreme Court struck down the punishment of denationalization for treason even though that crime could be punished by death. The defendants characterize their punishment as reducing them to 'caged animals' 'without purpose to reform,' to 'the lowest level of existence,' doomed to 'the dismal spectre of gradual annihilation.' Their sentences, the defendants argue, are the 'ultimate degradation unsurpassed in enormity.'

"Admittedly punishment less severe than death can be unconstitutional under an eighth amendment test. However, we do not think that *Trop* requires the blanket invalidation of paroleless life sentences. The Supreme Court itself considered and upheld such a sentence imposed as a condition to presidential commutation of a death sentence.

The no–parole condition attached to the commutation of his death sentence is similar to sanctions imposed by legislatures such as mandatory minimum sentences or statutes otherwise precluding parole; it does not offend the Constitution.

*Schick v. Reed*, 419 U.S. 256, 267, 95 S.Ct. 379, 385, 42 L.Ed.2d 430 (1974) (footnote omitted). *Schick* deals with the presidential pardoning power; it might be sui generis. However since unconstitutional conditions cannot be imposed even on matters of grace, *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); see Van Alstyne, The Demise of the Right–Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439, 1445–49 (1968), we believe that the Supreme

Court would not have upheld a paroleless life sentence even under the pardoning power unless the sentence itself were valid.

\* \* \* \* \* \*

"Assuming arguendo that an arbitrary sentence violates the eighth amendment, not all of the components of the test of arbitrariness used to review capital crimes apply in evaluating sentences for noncapital crimes. See *Woodson v. North Carolina,* supra, 428 U.S. at 304, 96 S.Ct. 2978 [at 2991]; *Gregg v. Georgia,* supra, 428 U.S. at 188–89, 96 S.Ct. 2909 [at 2932]. Death is unique among punishments; it is different in kind rather than degree. *Woodson v. North Carolina,* supra, 428 U.S. at 303–04, 96 S.Ct. 2978 [at 2990–2991]. We therefore hold that RSA 630:1–a III (Supp.1977) is valid under the Federal Constitution.

\* \* \* \* \* \*

"The State's important goals in confining someone for life are well served by withholding the possibility of parole; and the punishment is not a sentence of extermination because the prisoner has many opportunities to improve his life, culminating with a pardon if he can demonstrate to the Governor and Council his fitness to return to society without being a threat to it. We cannot say that the legislature is powerless to make the judgment that certain heinous crimes merit imprisonment for life without parole." 386 A.2d at 812–814.

Other cases to the same effect include *People v. Hall,* 396 Mich. 650, 242 N.W.2d 377, 380[9] (1976); *State v. Parle,* 110 Ariz. 517, 521 P.2d 604, 608[7] (1974), cert. den. 419 U.S. 1003, 95 S.Ct. 324, 42 L.Ed.2d 279 (1974); *State v. Forrester,* 21 Wash.App. 855, 587 P.2d 179, 188–189[16, 17] (1978).

Argument that constitutional guaranties require discretion on the part of the jury in fixing punishment are answered by *State v. Higgins,* 592 S.W.2d 151, 155–156[4] (Mo. banc 1979). *Higgins* also answers the contention that the judiciary must retain the right to review the appropriateness of the

sentence in any case. 592 S.W.2d 156–157[5]. *Higgins* rejects the view of Judge McMillian in his dissenting opinion in *Motley,* the authority relied upon by appellant in this connection.

Appellant's attack upon the constitutionality of the punishment statute here involved is without merit and the trial court did not err in overruling his motions to dismiss on such grounds.

## II

### *Motions to Suppress*

Two of appellant's points are based upon the contention that the statement which he gave to officers following his arrest was involuntary because it was the product of an illegal arrest; because it was made without an intelligent waiver of his rights as a result of physical and mental exhaustion at the time of the statement; and because it was the result of pressure and harassment of his mother by anonymous telephone callers. On this basis, appellant contends that his motion to suppress his statements should have been sustained. He also contends that his motion to suppress items of physical evidence obtained under a search warrant should have been sustained because the officer relied upon his involuntary statement as the basis for the application for the search warrant.

Motions to suppress the statements of appellant and to suppress the use in evidence of the products of a search warrant were filed and a hearing held on the motions. At the conclusion of the hearing, the trial court overruled both motions. Because the record did not demonstrate unmistakably that the trial court had found that the statements of appellant had been made voluntarily, as required by *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), this court, following the procedure approved in *State v. Glenn,* 429 S.W.2d 225 (Mo. banc 1968), ordered the trial court, upon due notice and with appellant present, to consider the evidence and make an express finding on the voluntariness of appellant's statements. That procedure was followed and the trial court made

an express finding that appellant's statements were voluntarily made.

In this Court, appellant's argument that his statements were not voluntary is based almost exclusively upon his version of the circumstances surrounding their making. However, the review in this Court is directed at the adequacy of the evidence to support the trial court's finding.

Viewing the evidence in that light, it showed that appellant was arrested at Gerster around 3:00 P.M., May 17. At the scene of the arrest, Sergeant Selvey of the Missouri State Highway Patrol, read a *Miranda* rights statement to appellant and asked appellant whether he understood his rights. Appellant replied affirmatively. The sergeant asked appellant if he would talk to them and he replied negatively. The sergeant asked where Mr. Frazier was and appellant said he knew nothing about it.

Appellant was taken to an FBI office in Springfield. There, in the presence of two FBI agents and a U.S. Commissioner, he requested to call an attorney. He called an attorney but the attorney could not come to see him. Appellant then called his mother and told her of his arrest.

At 5:32, Special Agent Rasmussen of the FBI began interrogation of appellant. He first produced a *Miranda* statement card which he read to appellant and permitted appellant to read. In the presence of Rasmussen and another agent, appellant signed the card, acknowledging that he had been advised of his rights and understood them and consenting to interrogation.

Rasmussen testified that he conducted the interrogation. He testified that no threats or promises of leniency were made. He stated that appellant was unkempt and appeared tired, but was alert and responded to questioning. He made no complaint of being tired. In the course of the interrogation, appellant said that he was hungry and food was obtained for him. Appellant gave Rasmussen the information concerning the escapade and his part in it. He told where Frazier's body could be found and the information was conveyed to law enforcement

officers, resulting in the discovery of the body. Rasmussen concluded his interview with appellant at 9:10 P.M.

Appellant was then taken to the Greene County jail. At approximately 9:30 P.M., Trooper Woods of the Missouri State Highway Patrol saw appellant in the Greene County jail, read *Miranda* rights to him and asked if appellant would talk to him and appellant agreed to do so and told him of the Frazier murder. The interview by Woods lasted 45 minutes to an hour and terminated when appellant said he was tired. Woods testified that no threats or promises were made and that appellant appeared normal.

The next day Woods saw appellant at the Hickory County sheriff's office at Hermitage. At about 3:30 P.M., he began an interrogation which was recorded on a cassette recorder and subsequently transcribed. Woods reminded him of the *Miranda* warnings. Appellant said that he had made three attempts to get in touch with an attorney but had been unsuccessful. He said: "I can't get a hold of one, but I feel that you'uns need this information. It just can't wait for me to get an attorney." The interrogation proceeded, lasting about two hours and producing eventually a 58–page typed statement which appellant latter read, signing each page and making corrections he deemed called for. No threats or promises were made and appellant at no time requested that the interrogation cease.

Appellant's contention here is based upon his testimony at the suppression hearing that he had slept only one hour in the 48 to 52 hours preceding his arrest. He also testified that, when he was taken to the FBI office in Springfield, he was permitted to call his mother and she told him that if he knew anything about Frazier to "tell somebody because she was getting threatening phone calls." According to appellant, he and his mother were extremely close and the information he received from her was very upsetting to him. He told the FBI agents about the conversation with his mother and they told him they would get in touch with the Polk County sheriff and

have him get in touch with his mother. He wasn't satisfied that the FBI was acting quickly enough and he told them, "I am going to give you a statement and you do something to protect my mom."

According to appellant, when Woods started questioning him after he had given a statement to the FBI, appellant asked him to let him get some sleep. The trooper said he would in a little while and "hours of questioning" followed. Appellant also testified that, after Woods' original interrogation ceased, he obtained little sleep in the Greene County jail because other persons confined there "kept asking me all of these questions. * * * I was pretty famous by then." He said that he was "still tired" at the interrogation in Hickory County and that he responded to interrogation there "to get it over with."

Rasmussen denied that appellant stated to him that he would make a statement if his mother would be protected.

■ On this record, the conclusion of the trial judge that appellant's statements to Rasmussen and Woods were voluntary is fully supported by the evidence. The state's evidence showed that appellant was informed of his constitutional rights, that he was capable of understanding these rights and that no physical force, threats, promises or coercive tactics were used to obtain the statements. *State v. Crowley*, 571 S.W.2d 460, 464[9, 10] (Mo.App.1978).

Although appellant argues that questioning by the officers persisted after he had requested the right to consult an attorney, the state's evidence was that, when he was taken to the FBI office, he was first accorded a telephone call to an attorney. According to appellant, he did call an attorney but the attorney could not come to Springfield. Appellant testified that questioning continued after the phone call to the attorney. However, he also testified that "right after" he called the attorney, he called his mother and was told of the harassing calls which she had received.

The state's evidence was that, after appellant had made the two telephone calls,

the *Miranda* rights were read to him, he was permitted to read them and then he signed an acknowledgment of his understanding and waiver of those rights.

■ Appellant would avoid the effect of such waiver on the grounds that his lack of sleep and fatigue precluded a knowing and intelligent waiver of his rights. None of appellant's testimony was directed at any claim of lack of understanding of his rights or of the consequences of a waiver of such rights. Appellant did not controvert Rasmussen's testimony that the *Miranda* rights were read to him, that appellant read the statement of his rights and thereafter signed the assent to the waiver.

■ As for the complaint that his statement was involuntary because it was induced by fear of injury to his mother, that is not the sort of inducement which renders the statement involuntary in the eyes of law. *United States v. Mullens*, 536 F.2d 997, 1000[2] (2d Cir., 1976); *United States v. McShane*, 462 F.2d 5, 6–8[3] (9th Cir., 1972). Appellant's version was simply that the FBI agents offered to call local authorities and report the harassing calls. However, because he felt the agent was not proceeding quickly enough, appellant said: "I am going to give you a statement and you protect my mom." Certainly there was no threat or coercion on the part of the officers, even if appellant's version is accepted.

■ Appellant dwells upon the duration of the interrogation. However, the state's evidence was that the interrogation by the FBI began at about 5:30 P.M. Evidence at the trial was that law enforcement officers, acting upon the information that appellant gave the FBI of the whereabouts of Frazier's body, were at the scene at around 6:00 P.M. Obviously, appellant disclosed the essential facts of the offense shortly after the interrogation began and his confession was not the product of a protracted interrogation.

■ Appellant also attacks the voluntariness of his statements on the grounds that they were the product of an illegal arrest. His argument on this score is

premised upon the proposition that his arrest was occasioned by the tip which the FBI and Highway Patrol received concerning his whereabouts. The trial court found the arrest valid because there was an outstanding warrant for appellant's arrest for escape from jail in Hickory County. Sergeant Selvey of the Highway Patrol who received the tip concerning appellant's whereabouts and who participated in his arrest testified that at that time he was aware that a warrant had been issued for appellant's arrest for breaking jail. The trial court, therefore, properly found that appellant's arrest was valid. *State v. Bradley*, 515 S.W.2d 826, 828[3] (Mo.App.1974). See *Albright v. United States*, 329 F.2d 70 (10th Cir., 1964); cert. den. 379 U.S. 907, 85 S.Ct. 201, 13 L.Ed.2d 179 (1964); *State v. Everett*, 110 Ariz. 429, 520 P.2d 301, 303[1–3] (banc 1974); cert. den. 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974).

Inasmuch as appellant's objection to the use in evidence of items procured by a search warrant is based upon the contention that the statements of appellant, above considered, which provided the basis for the issuance of the search warrant, were involuntary, disposition of that question also answers the complaints directed at the use of the seized evidence.

## III

### Jury Selection

Appellant raises several points involving selection of the jury. He complains of the trial court's ruling which prevented trial counsel's inquiring of panel members whether or not they knew or thought they knew the penalty for capital murder. He also complains of the court's refusal to permit inquiries as to knowledge of the disposition of the cases of the other persons involved in the Frazier death. With respect to the first inquiry, appellant argues that the refusal to permit such questions precluded the discovery of panel members who knew that the punishment for capital murder included a prohibition against probation and parole for 50 years. Appellant asserts that had he discovered such knowledge, he

intended to, and should have been permitted to, inquire of such persons about prejudice against the parole system, in order to ascertain the existence of such prejudice which might cause a juror to find the defendant guilty of capital murder rather than a lesser offense for which the possibility of parole existed.

As for the second inquiry, appellant argues that the court's ruling precluded discovery of panel members who knew the results of the trials of the Thomases which resulted in convictions, thereby preventing trial counsel from challenging for cause or using his preemptory challenges to remove from the panel persons whose judgment might be affected by the fact that persons with whom the defendant had allegedly acted had already been convicted.

" * * * [A] trial court necessarily and properly has considerable discretion in control and conduct of voir dire examination of veniremen; and an appellate court will differ or interfere with the exercise of that discretion only when the record shows a manifest abuse of discretion and a real probability of injury to the complaining party." *State v. Scott*, 515 S.W.2d 524, 527[1] (Mo.1974). See also *State v. Yowell*, 513 S.W.2d 397, 403[4–6] (Mo. banc 1974).

■ With respect to the second inquiry, defense counsel did interrogate the veniremen at length as to any knowledge of the case which might prejudice them against appellant. That inquiry would have reached knowledge as to the disposition of cases against others involved in the event. This Court cannot say that the refusal to permit the direct inquiry, which might well have introduced the question of what disposition was made in the other cases into the veniremen's minds, involved a "real probability of injury" to the appellant.

The ruling on the first inquiry will be considered with a related objection based upon the trial court's failure to advise the veniremen that the punishment for capital murder of life imprisonment included the 50–year prohibition of parole or probation. This question arose when the prosecutor, in

questioning the panel, said that the state would seek the maximum punishment for capital murder, "life imprisonment," and that the death penalty was not applicable. Defense counsel's request that the jury be informed of the limitation on parole was denied, as was his request for a mistrial. He now contends that the trial court erred in failing to inform the jury that the punishment included the restriction upon parole or probation.

 In each of these instances, appellant was endeavoring to place the question of parole or probation before the jury. In *State v. Rollins*, 449 S.W.2d 585, 591[5] (Mo. 1970), the court said: "We now hold that it is not error for the trial court to fail or refuse to inform the jury that no parole, probation, suspended sentences, or any other form of judicial clemency would be exercised in the event of conviction. * * * The question of future clemency is extraneous to a proper determination of issues of guilt and punishment by the jury. It should be of no concern to them." Inasmuch as the proposed inquiry and the request for further instruction by the court related to matters "of no concern" to the jury, the trial court did not abuse its discretion in its rulings. See *State v. Sempsrott*, 587 S.W.2d 630, 634–635[10] (Mo.App.1979); *State v. Hanson*, 587 S.W.2d 895, 900–902[4]–[7] (Mo.App.1979).

Appellant contends that the trial court erred in failing to strike panel member Eddie Thompson for cause. The voir dire upon which this contention rests is as follows:

Panel Member Thompson, in response to a question by defense counsel as to whether a friend or relative had "been killed by criminal means," stated that a friend of his was shot at Fort Leonard Wood in 1973.

Defense counsel (Mr. Douglas) asked:

"Let me ask you if that series of events would tend to color your thinking here a little bit today? This is a murder trial.

"MR. THOMPSON: Yes, sir, it might.

"MR. DOUGLAS: How close of a friend was this?

"MR. THOMPSON: Well, we grew up together and went to school together.

"MR. DOUGLAS: You were childhood chums then?

"MR. THOMPSON: Right.

"MR. DOUGLAS: Was it a–without going into facts in great detail, did it involve firearms, stabbing?

"MR. THOMPSON: Firearms.

"MR. DOUGLAS: Okay–you do believe that you might have a hard time putting that out of your mind as far as considering the facts of this instant case?

"MR. THOMPSON: Well, I can't tell you for sure, you know, it is hard to tell right now, you know.

"MR. DOUGLAS: Let me come back to that, you think about that for a minute or two.

* * * * * *

"MR. DOUGLAS: Mr. Thompson, do you have any further thoughts?

"MR. THOMPSON: No.

"MR. DOUGLAS: I don't want to put you on the spot.

"MR. THOMPSON: No, sir, no other thoughts.

"MR. DOUGLAS: You would try but you don't know whether you could, is that a fair conclusion?

"MR. THOMPSON: That is what I would do, try.

"MR. DOUGLAS: But in searching your mind you are not sure whether you could or could not?

"MR. THOMPSON: That is correct.

"MR. DOUGLAS: I want those to be your words, not mine.

"MR. THOMPSON: That is right.

"MR. DOUGLAS: Okay, you feel comfortable with what I said?

"MR. THOMPSON: Yes."

 The determination of the venireman's qualifications was a matter for the trial court in the exercise of sound judicial discretion. The trial court's determination will be rejected only upon a clear showing of abuse of discretion. *State v. DeClue*, 400 S.W.2d 50, 57[12] (Mo.1966). "All doubt should be resolved in favor of the finding of

the trial court because he is in a far better position to determine a challenge for cause than an appellate court." *State v. Treadway*, 558 S.W.2d 646, 649[1, 2] (Mo. banc 1977) (overruled as to another issue in *Sours v. State*, 593 S.W.2d 208 (Mo. banc 1980)).

In this case, a friend of the venireman had been murdered. He agreed that such fact might "tend to color [his] thinking here a little bit * * *." He could not say "for sure" that he could put that event out of his mind in considering the facts of the case to be tried. He could try to do so but was not sure whether he could or not.

■ Were the responses of the venireman such that the trial court could not properly conclude that he would be a fair and impartial juror? The venireman did not state or infer that he would be unable to judge the case fairly on the evidence which he might hear. At the best his answers indicated a feeling against murder, not a feeling against the defendant who was charged with murder. The question of whether or not the experience could be "put out of his mind" is not determinative of the qualifications of the venireman. The question properly is whether or not that experience would produce bias or prejudice against the defendant on trial and that question simply was not put as it was in the case of *State v. Thompson*, 541 S.W.2d 16 (Mo.App.1976), relied upon by appellant. On this record, it cannot be said that the trial court's ruling was an abuse of discretion. See *State v. Green*, 511 S.W.2d 867, 876–877[15] (Mo.1974); *State v. Pride*, 567 S.W.2d 426, 432–433[9]–[14] (Mo.App.1978).

## IV

### Trial Incidents

After the jury had been sworn and the preliminary instructions read by the court, the prosecuting attorney began his opening statement. The statement was interrupted and a recess taken when appellant pushed his counsel who was conferring with him, causing him to fall against the bench. Appellant, in a loud voice, called his counsel a son of a bitch. Defense counsel's motion for a mistrial was denied. Counsel also moved to be permitted to withdraw and that motion was denied. In this Court, the trial court's failure to declare a mistrial and overruling the motion to withdraw is assigned as error, appellant contending that the incident so prejudiced the jury against him that he could not thereafter receive a fair trial, and destroyed the credibility and effectiveness of defense counsel in the minds of the jury, depriving appellant of a fair trial.

■ The failure to grant a mistrial was not error. The trial court was not obliged to reward appellant for his outburst. *State v. McGinnis*, 441 S.W.2d 715, 717[1] (Mo.1969); *State v. Martin*, 525 S.W.2d 804, 810–811[4, 5] (Mo.App.1975). The request of counsel to withdraw was likewise addressed to the trial court's discretion. In view of the timing of the request, abuse of discretion has not been demonstrated. *United States v. Williams*, 594 F.2d 1258, 1260–1261[4] (9th Cir. 1979). The trial court had previously heard appellant's pro se motion for change of counsel and had concluded that appellant had shown no "justifiable dissatisfaction with his appointed counsel." *United States v. Hart*, 557 F.2d 162, 163 (8th Cir. 1977). The fact of the prior motion does not demonstrate an abuse of discretion in the ruling upon the request to withdraw made at the trial.

Appellant complains of the failure of the trial court to grant a mistrial because of the "continual weeping and temporary inability to testify on the part of witness Vonetta Frazier, widow of Phillip Frazier * * *." Appellant asserts that her conduct was prejudicial and created an inflammatory atmosphere as far as the jury was concerned and precluded the possibility of a fair trial.

Mrs. Frazier was the first witness called by the state. In the course of her testimony, the reporter noted "The witness is crying through all of her testimony." Twice the proceedings were stopped because of her emotional display. On the first occasion a recess was declared. On both occasions, appellant's counsel moved for a mistrial and the motions were denied.

■ Given the oft–noted drastic nature of the remedy of a mistrial, the trial court's refusal to do so in these instances was not error. The court's remarks at the time of objections of defense counsel showed that he was aware of the witness's behavior but did not regard it as seriously as did defense counsel. At the time of the first objection, he noted that the witness had "sporadically cried although not audibly * * *." He directed the prosecutor to emphasize to the witness that she should make every effort to avoid a display of emotion. Upon the second occasion, the trial court disagreed with defense counsel's statement that the witness "broke down crying." The court noted only "some crying." The trial court's conclusion that a mistrial was not warranted has not been shown to have amounted to an abuse of discretion. *State v. Swindell*, 271 S.W.2d 533, 536[6–9] (Mo.1954). Certainly the conduct of the witness did not approach the "stage performance" involving the prosecutor and sobbing parents of the deceased, condemned in *State v. Connor*, 252 S.W. 713, 722[13] (Mo.1923), cited and relied upon by appellant.

■ The above–mentioned second interruption of the witness's testimony was accompanied by her statement, in response to the question as to whether or not she recognized appellant's voice on the evening of the robbery. "I can't tell you that I did–it was a night of hell and toward the end–." Defense counsel immediately moved that the answer be stricken and then, out of the presence of the jury, told the court that an instruction to disregard the statement would do no possible good and that only a mistrial would be effective. The request for a mistrial was denied. Appellant contends that the statement was so inflammatory and prejudicial that it prevented him from receiving a fair trial and that the refusal of a mistrial was error.

As authority for the claim of error, appellant cites *State v. Mullen*, 528 S.W.2d 517, 523–524[17]–[21] (Mo.App.1975), in which the court concluded that there was no error in refusing to declare a mistrial because of a prejudicial, voluntary statement of a witness, the court noting that the trial court had promptly sustained the objection to the remark. Appellant here complains that the trial court did not act on his motion to strike the answer and took no further action regarding it. However, the trial court here had counsel's request for nothing short of a mistrial and the claim of error is in the refusal of that relief. Again, considering the drastic nature of such remedy, the trial court's action was not an abuse of discretion. *State v. Jackson*, 506 S.W.2d 424, 427–428[4] (Mo.1974).

■ Tom Buel, a forensic analyst for the Missouri State Highway Patrol, testified regarding laboratory tests performed on bullets found at the scene and guns identified as having been used by appellant and another participant in the affair. In testimony regarding one of the bullets, Buel was asked where he had seen the item before. He replied: "Previously in Court and also in my ____." Defense counsel's motion for a mistrial because of reference to a prior trial was overruled. Shortly afterward, the witness was asked a similar question about two bullets and he again replied "Previously in court and also during my examination." Defense counsel again moved for a mistrial and the request was denied.

In this Court appellant contends that the answers of the witness called attention of the jury to prior trials of appellant's codefendants which resulted in conviction of one for capital murder and another for first degree murder and were therefore prejudicial. Appellant invokes the rule that evidence of the disposition of a codefendant's case is improper. *State v. McCarthy*, 567 S.W.2d 722 (Mo.App.1978). However, the testimony here involved did not refer to the disposition of any charge against codefendants. Therefore, the rule relied upon is inapplicable and the failure to grant a mistrial was not error.

■ Appellant also complains that the trial court erred in admitting into evidence State's Exhibit 6, a .38 Smith and Wesson revolver, and Exhibit 7, a portion of a spent .38 caliber bullet. Appellant con-

tends that Exhibit 6 was irrelevant and that no sufficient foundation was laid for the introduction of Exhibit 7 as having been a part of a spent .38 caliber bullet. There was evidence that Exhibit 6 was the weapon appellant had and used in the affair. The testimony of Buel was sufficient to identify Exhibit 7 as a portion of a .38 caliber bullet fired from a Smith and Wesson weapon. The witness did acknowledge that there was a remote possibility that Exhibit 7 had been a part of a .32 caliber bullet but he was of the opinion that it came from a .38 caliber Smith and Wesson. Appellant's claims of error are without merit.

## V

### Instruction Error

By his reply brief appellant has raised a new claim of error which was not called to the trial court's attention at the trial or in the motion for new trial. Despite the irregularities in the presentation of the question, it will be considered under the plain error rule. Rule 29.12(b).

The trial court instructed on capital murder, murder in the first degree, murder in the second degree and manslaughter. The punishment was not stated in any of the verdict–directing instructions. The jury returned a verdict of guilty of capital murder. The court then instructed the jury that the only applicable punishment was imprisonment for life without eligibility for parole for 50 years and the foreman was directed to sign a verdict so fixing the punishment. The foreman did so and appellant was sentenced accordingly.

This case was tried in December, 1978. By MAI–CR 2d 15.00 2. b., promulgated April 12, 1978, instructions should have been in the form prescribed by the 6.00 series of MAI–CR (first), effective September 28, 1975. Such form included the punishment in the verdict–directing instruction for each grade of homicide.

The procedure followed by the trial court did not result in manifest injustice or deprive appellant of a fair trial. This conclusion is evident from the fact that had this homicide occurred after May 22, 1977, and the state waived the death penalty, the jury would have been instructed as it was in this case. "If capital murder is submitted to the jury, the punishment for that offense and for any lesser included offense submitted therewith must be omitted, even though the death penalty for capital murder has been waived." MAI–CR 2d, 15.00 9. a. In fact, in view of Section 1.160, RSMo 1978, a good case may be made for the procedure followed by the trial court. In any event, no error calling for reversal occurred.

Judgment affirmed.

RENDLEN, WELLIVER, MORGAN and HIGGINS, JJ., concur.

BARDGETT, C. J., concurs in separate concurring opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

DONNELLY, J., not sitting.

BARDGETT, Chief Justice, concurring.

I concur in the principal opinion. I do not agree however that it was correct for the trial court to deny defense counsel's request that the jury be informed of the full statutory sentence for capital murder in this case. The death penalty was not applicable. The prosecuting attorney advised the jury that he would be seeking the maximum punishment available in this case "which is life imprisonment". The court refused to permit the jury to be informed that the maximum punishment was "imprisonment ... during his natural life and shall not be eligible for probation or parole until he has served a minimum of fifty years of his sentence." Murder in the first degree was and is punishable by life imprisonment, but the statutory sentence in that instance does not mandate that the first fifty years be actually served in prison. Murder in the second degree is punishable by a sentence of from ten years to life imprisonment. However, should life imprisonment be imposed upon conviction of murder in the second degree, the statutory

law does not require the first fifty years to be served in prison. In my opinion, if the jury is to be informed about the punishment available in a case, then it should be *correctly* informed and not misinformed. Certainly no one has any doubt about whether the penalty of life imprisonment without probation or parole for fifty years is a more severe sentence than life imprisonment without the limitation. That is precisely why the legislature enacted it and it is part and parcel of the statutory punishment. In this case the prosecutor was permitted to impanel the jury reference punishment—"life imprisonment", but the defendant was refused the right to do so. In my opinion, this was error. However, I do not believe that the defendant was prejudiced by it in this case and I therefore concur.

Earlier cases involving the question of whether a jury should be informed concerning the possibility of parole or probation are not apposite to this case. In those cases the prohibition against release from the penitentiary for fifty years was not part of the sentence for the particular crime. In this case the prohibition against that type of release was part of the sentence and did not refer to the possibility of future clemency. The statute prohibited any clemency by way of probation or parole for the specified period. Any doubt as to whether or not the prohibition against release by way of probation or parole for the first fifty years, where the defendant is convicted of capital murder and sentenced to life imprisonment, is part of the sentence itself is laid to rest by the discussion in the principal opinion concerning the allegation that the mandatory sentence of life imprisonment without possibility of parole for fifty years constitutes cruel and unusual punishment. It is clear that all courts have regarded the prohibition against parole for the specified period of fifty years as part of the sentence and punishment.

In my opinion, the attorneys for the state and the defense are entitled to question members of the panel against the backdrop of the possible statutory punishment for this particular crime as much now as they ever were. More importantly than that, however, the parties are entitled to have the jury correctly informed if they are to be informed about it at all.

SEILER, Judge, dissenting.

I agree with Chief Justice Bardgett that it was error, after the prosecutor was permitted to tell the jury the punishment for capital murder was life imprisonment, not to permit defendant's counsel to inform the jury that the punishment was life without probation or parole for fifty years. If the jury is to be informed as to the punishment that might be assessed, it must be informed correctly, *State v. Bevins*, 328 Mo. 1046, 43 S.W.2d 432, 435 (banc 1931). In my opinion, this error was prejudicial to defendant's right to a fair trial. It permitted the jury to select the most serious offense available (which it did) under the false belief that it would result in a less severe penalty than proved to be the case. This gave the prosecution an unfair advantage and made it easier to obtain the maximum conviction.

It also belittles the jury system. It treats the jury as though it is not important that it be given correct information.