[No. 2462–3.    Division Three.    November 14, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN L.
FORRESTER, *Appellant.*

856

*Richard L. Cease, Public Defender,* and *Roger K. Gigler* and *William Nathans, Assistants,* for appellant.

*Donald C. Brockett, Prosecuting Attorney,* for respondent.

GREEN, J.—Defendant appeals his jury convictions on the charges of aggravated first–degree murder and first–degree extortion.

He raises the following issues: (1) Were the tape recordings of the defendant's telephone conversations with a police officer made in violation of RCW 9.73.030? (2) Was the defendant's confession to a police detective voluntary? (3) Was the admission into evidence of a typed manuscript of the defendant's tape–recorded confession prejudicial error? (4) Was the admission into evidence of certain photographs of the victims' bodies prejudicial error? (5) Was the testimony of Dr. Sol Levy proper rebuttal? (6) Do the alleged murders fall within the statutory definition of aggravated first–degree murder? (7) Did the trial court have authority to impose a sentence of life imprisonment without possibility of parole? and (8) Does such a sentence violate the Eighth Amendment prohibition against cruel and unusual punishment?

On December 15, 1976, James and Hattie Woods, both age 73, were murdered in their home on Spokane's north side. The victims' throats were slashed, Mrs. Woods had been shot, and Mr. Woods had been stabbed in the side and in one leg. The condition of the house indicated that the Woodses had struggled with their slayer. An emptied wallet and purse pointed to robbery as the motive for the double homicide. However, clues to the killer's identity were minimal. They included a .22 calibre pistol left at the scene, a palm print on a figurine that had apparently been

used as a weapon, and the report of a nurse who worked across the street from the Woodses' residence and had seen someone leaving the house about 5 p.m. the evening of the murders.

Almost 10 days later, on Christmas Eve, the police received a telephone call from a person claiming to be the murderer and threatening to repeat his crime if he was not paid $10,000 by 9 p.m. Monday, December 27. He said that he would call again on Monday night and that the Mayor and the Chief of Police should be present to hear his demands. During a second call that same evening, this person again informed Detective Wilson, the police operator, that he would call on Monday night. The detective requested that the caller corroborate his claim that he was responsible for the homicides. In response, the caller described how he had killed the couple.

In preparation for the call expected on Monday night, the police installed a tape recording device on their telephone. When the extortionist called, he demanded that the police send a young boy with the $10,000 to the men's restroom at the Diamond Bowling Lanes. Again, the extortionist threatened to commit further murders should the police fail to cooperate, and in the latter event to reveal that lack of cooperation to the press. The extortionist also answered several questions concerning the details of the murders. He called a second time and inquired about the denominations of the currency. Police officers who had established surveillance at the bowling lanes testified that they observed the defendant in a phone booth outside the bowling lanes at about the time of the second call. They arrested him when he went into the men's restroom, advised him of his rights, and then transported him to the police station. When it was discovered that the defendant was only 17 years old, he was transferred to the Juvenile Department and booked on a charge of first–degree extortion. During this time, the defendant was twice again advised of his rights, and he chose to waive them.

Following booking procedures in juvenile, the defendant was taken to an interview room in the main police station. There, Detective Teigen questioned the defendant in the presence of Detective Staudinger, the police officer who had handled the telephone calls that night. Detective Teigen was familiar with those phone conversations since he had listened to the tape of the calls.

According to Detective Teigen, he said to the defendant: "It's time you help yourself." The detective then told him that the police had information that he was the one who had made the phone calls in which the caller had confessed to the killings. He further informed the defendant that the police had a palm print left at the murder scene which they could compare with his, and that a witness could identify him as the person leaving the Woodses' home. The defendant then stated, "I killed those two people."

Following this admission, Detective Teigen took a complete oral statement from the defendant, then taped the defendant's confession. In these confessions, the defendant described how he had forced his way into the Woodses' residence, then killed the couple when they attempted to resist. After this interview, Dr. Sol Levy, a psychiatrist, spoke with the defendant.

On January 6, 1977, juvenile court declined jurisdiction over the defendant. An information was filed in Superior Court charging him with aggravated first–degree murder, RCW 9A.32.045(6), and first–degree extortion, RCW 9A.56-.120. On May 16, 1977, a jury found defendant guilty of both charges.

First, the defendant contends (1) the court should not have allowed Detective Staudinger to testify concerning his two telephone conversations with the extortionist on the night of December 27, 1976, because those conversations were tape recorded in violation of RCW 9.73.030, and (2) the court should have barred evidence of the telephone conversations with Detective Wilson on December 24 and defendant's subsequent confessions to Detective Teigen and Dr. Levy because those statements were obtained as a

result of the police department's use of the unlawfully taped telephone conversations.

RCW 9.73.030 provided:

[I]t shall be unlawful for . . . the state of Washington, its agencies, and political subdivisions to intercept, *record or divulge* any:

(1) *Private communication* transmitted by telephone . . . between two or more individuals . . . by any device electronic or otherwise designed to record . . . said communication . . . without first obtaining the consent of *all* the participants in the communication;[1]

(Italics ours.) RCW 9.73.050 provides:

Any information obtained in violation of RCW 9.73.030 . . . shall be inadmissible in any civil or criminal case . . .

RCW 9.73.090[2] provided:

The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police and fire personnel in the following instances:

(1) Recording incoming telephone calls to police and fire stations for the purpose and only for the purpose of verifying the accuracy of reception of emergency calls.

---

[1]This statute was amended by the legislature and the amendment became effective after the trial of this case. It now reads:

"(1) . . . it shall be unlawful for . . . the state of Washington, its agencies, and political subdivisions to intercept, or record any:

"(a) Private communication transmitted by telephone . . . between two or more individuals . . . by any device electronic or otherwise designed to record . . . said communication . . . without first obtaining the consent of all the participants in the communication;

". . .

"(2) Notwithstanding the provisions of subsection (1) of this section, wire communications or conversations (a) of an emergency nature, such as the reporting of a fire, crime, or other disaster, or (b) which convey threats of *extortion,* blackmail, bodily harm, or other unlawful requests or demands . . . may be recorded with the consent of *one* party to the conversation." (Italics ours.)

[2]The amended version of RCW 9.73.090 states:

"(1) The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police and fire personnel in the following instances:

"(a) Recording incoming telephone calls to police and fire stations;"

It is the defendant's position that the telephone calls in question were private communications within the general provisions of RCW 9.73.030(1) and that the exclusion contained in RCW 9.73.090(1) is not applicable because the calls were not emergency calls and, further, because the recordings were not used for the narrow purpose of verifying the accuracy of reception. We disagree with the defendant. The telephone calls here are not private communications, and, therefore, they are not within the prohibitions of RCW 9.73.030(1).

■ The statute does not define the words "*private communication.*" In the absence of such a definition, we must attribute to the statutory terms their ordinary and usual meaning. *Warmington v. Department of Employment Security,* 12 Wn. App. 364, 529 P.2d 1142 (1974). *Webster's Third New International Dictionary* (1969) defines the word "private" as: "belonging to one's self . . . secret . . . intended only for the persons involved (a conversation) . . . holding a confidential relationship to something . . . a secret message: a private communication . . . secretly: not open or in public."

■■ To determine whether or not a telephone conversation is private, the court must consider the intent or reasonable expectations of the participants as manifested by the facts and circumstances of each case. Here, the defendant was using the telephone to commit the crime of extortion. The statements made by the defendant during the course of his conversations with Detective Staudinger are not the statements of a person who expects that his conversation will remain private. He knew or should have known that his demand for $10,000 could not be met from the personal funds of the policeman with whom he was speaking. Rather, the defendant intended to direct his extortion demand to the City of Spokane. In his first call, he told Detective Wilson that the Mayor and the Chief of Police should be present when he called on Monday night. Furthermore, he threatened to kill again if his demands were ignored, and he coupled this threat with a promise to

reveal to the press that the City had risked a second murder rather than pay him $10,000. These are not the statements of someone who expects the substance of his telephone call to remain confidential.

For these reasons, we hold that the trial court did not err when it permitted Detective Staudinger to testify concerning his phone conversations with the defendant. *State v. Wanrow,* 88 Wn.2d 221, 559 P.2d 548 (1977), cited by the defendant, is distinguishable. In *Wanrow,* our Supreme Court held that a telephone conversation in which the caller reported the commission of a crime was a private communication within the meaning of RCW 9.73.030.[3] Here, the caller was using the telephone to attempt the commission of a crime and to threaten the commission of other murders if his demands were not met. Under these circumstances, the conversations were lawfully recorded. Therefore, the recording could not taint the subsequent confessions or the defendant's admission that he was the one who had called on Friday night.

Second, the defendant contends that his confession to Detective Teigen was not voluntary. He asserts that he admitted the killings only because the detective impliedly promised to help him by writing a favorable report on his behalf for the judge and prosecutor.

On cross–examination, Detective Teigen testified:

MR. GIGLER: Did you make any promises to John to help him if he would confess?

DETECTIVE TEIGEN: I made no promises to John to help him. I told John it's time he helped himself.

MR. GIGLER: All right. Let's get rid of the word "promise." Did you say you would do anything for him?

DETECTIVE TEIGEN: I don't know if he would take it I would do anything for him. I did say that I do have to make reports . . . I told him that the prosecutor would get a copy of my report . . .

---

[3]The interpretation given RCW 9.73.030 prompted immediate amendment of that statute. For text of amendment, see footnotes 1 and 2.

The following colloquy occurred near the end of the defendant's taped confession:

Q. John, have there been any threats or promises made to you by Detective Staudinger or me or any of the police officers in order for you to give this statement?

A. No threats.

Q. Any promises?

A. That he would help me.

Q. No, I say were there any threats or promises made to you in order for you to give them this?

A. No.

In determining whether a confession is voluntary, the court must determine whether the officers' behavior overcame the defendant's will to resist. The officers' conduct need not be shocking in order for the court to make a finding of involuntariness. Rather, any direct or implied promise, however slight, may support such a finding or render the confession inadmissible. *State v. Riley*, 17 Wn. App. 732, 735, 565 P.2d 105 (1977), *review denied*, 89 Wn.2d 1014. Factors to consider in evaluating the voluntariness of the confession include the age, intelligence, and experience of the defendant. *State v. Baker*, 4 Wn. App. 121, 126, 480 P.2d 778 (1971), citing *State v. Prater*, 77 Wn.2d 526, 531–33, 463 P.2d 640 (1970). These factors take on added weight with respect to a young defendant, and the court must evaluate the probable effect on him, given his particular strengths and weaknesses. *State v. Riley, supra* at 735.

We are satisfied that Detective Teigen's statements to the defendant did not amount to an implied promise that a confession would help him. The detective merely told the defendant the truth, *i.e.*, that his report, good or bad, would go to the prosecuting attorney. As the trial judge noted in his decision denying the motion to suppress, the defendant was no inexperienced youth. *See State v. Darst*, 65 Wn.2d 808, 816, 399 P.2d 618 (1965); *State v. Baker, supra.* Previous to his arrest here, he had been charged with numerous burglaries, and was familiar with his rights and with the technique of police interrogation. He knew

that he could not be compelled to talk; in fact, the prosecutor, on cross-examination, elicited from the defendant the information that he had refused to waive his· Fifth Amendment rights on a prior occasion when questioned about a burglary. Furthermore, the setting here was patently adversarial. He had been taken to juvenile, but the juvenile authorities relinquished him to the custody of the police officers. Under these circumstances, the defendant could not easily believe that the officer was his friend and that he would help him if he cooperated. We find no error in allowing Detective Teigen's testimony concerning the contents of defendant's confession.

Third, the defendant asserts that the trial court erred when it admitted a typed transcript of his tape–recorded confession to Detective Teigen and allowed the jury to examine the transcript during their deliberations. He argues that since the tape recording itself was already in evidence, the transcript was repetitive and, therefore, over–emphasized one portion of the evidence.

■ While Washington has held that a typed transcript *or* the tape recording itself is admissible in evidence in the sound discretion of the trial judge, *State v. White,* 60 Wn.2d 551, 556–57, 374 P.2d 942 (1962); *State v. Meyer,* 37 Wn.2d 759, 767–68, 226 P.2d 204 (1951), the court has not yet been presented with a case in which *both* the transcript and the recording were admitted. Very few jurisdictions have considered the issue and they seem to differ on the question. In *Bonicelli v. State,* 339 P.2d 1063, 1065 (Okla. Ct. App. 1959), the Oklahoma court held that the defendant's confession was inadmissible for any purpose because the State had not established a corpus delicti. In dicta, the court opined that the admission of written transcripts of the tape–recorded confession violated the best evidence rule and the rules against repetition, improper emphasis, and hearsay. In *Duggan v. State,* 189 So. 2d 890, 891 (Fla. Ct. App. 1966), it was held that the trial court committed error when it admitted a transcript of an unclear tape. There, the state itself had characterized the transcript as

"one man's opinion as to what the tape said." To the contrary, other courts have held that both the tape recording and the transcript are admissible, in the sound discretion of the trial judge. *United States v. Turner,* 528 F.2d 143 (9th Cir. 1975); *United States v. Koska,* 443 F.2d 1167, 1169 (2d Cir. 1971). In *Turner,* the court noted that replaying the recording several times would more likely emphasize the contents of the confession than would a review of the transcript.

We hold that the admission of both tape and transcript is a matter within the sound discretion of the trial court, and that the trial court properly exercised its discretion in the instant case. Here, the parties agreed that the transcript was an accurate copy of the tape recording, and the trial judge reasoned:

> While the recording is a good recording, the machine is not capable of a great deal of volume, and one juror, juror No. 2, raised his hand as the tape was being played, indicating he was not hearing all of it. I feel almost certain that we would get a request to replay the tape, and rather than do that, having in mind all the difficulties that would be involved, I feel I will let the transcript go in.

We find no error.

Fourth, the defendant assigns error to the trial court's admitting into evidence certain photographs of the victims' bodies. He contends that the pictures were inflammatory and that they were unnecessarily duplicative of pictures already in evidence.

In *State v. Harstad,* 17 Wn. App. 631, 637–38, 564 P.2d 824 (1977), the court stated that gruesome photographs designed primarily to arouse the jury's passion are not admissible. The test of admissibility involves balancing the photographs' probative value against their prejudicial effect. Whether the harmful effect of the photographs outweighs their value as evidence is within the discretion of the trial judge, and the appellate court will reverse the trial

court only upon a showing of abuse of discretion. *State v. Adams*, 76 Wn.2d 650, 656, 458 P.2d 558 (1969).

We have reviewed the photographs here and find no abuse of discretion. The photographs, which defendant claims are duplicative, depict the victims' knife wounds not clearly visible in other photographs. Further, they are useful in explaining the testimony. While the pictures are gruesome, as was the crime itself, we cannot say that their inflammatory effect outweighed their probative value.

■ Fifth, the defendant objects to the rebuttal testimony of Dr. Sol Levy, the psychiatrist who interviewed him immediately after his confession to Detective Teigen. Rebuttal evidence is admitted to enable the plaintiff to answer new matter presented by the defense and the trial court's admission of such evidence will not be overturned absent a manifest abuse of discretion. *State v. White*, 74 Wn.2d 386, 394, 444 P.2d 661 (1968). Here, the defendant contends that the testimony was improper because he had already admitted that he had confessed to Dr. Levy. However, the defendant explained that his confession to Dr. Levy was the result of his confusion. Consequently, Dr. Levy's testimony concerning his impression of the emotional state and the truthfulness of the defendant was appropriate rebuttal. We find no abuse of the trial court's discretion.

Sixth, the defendant asserts that the alleged murders do not fall within the statutory definition of aggravated first–degree murder and that the State erred when it charged him with that offense. RCW 9A.32.045 provides:

> A person is guilty of aggravated murder in the first degree when he commits murder in the first degree as defined in RCW 9A.32.030 under or accompanied by any of the following circumstances:
>
> . . .
>
> (6) There was more than one victim and the said murders were part of a common scheme or plan, or the result of a single act of the defendant.

The information charged the defendant with aggravated first–degree murder, committed as follows:

> That the defendant, John Lee Forrester . . . *as a result of the single act of first–degree robbery,* did shoot and stab Hattie G. Woods and strike and stab James H. Woods, . . . thereby causing [their deaths].

(Italics ours.) Specifically, the defendant contends that in order for RCW 9A.32.045 to apply, the murders must directly result from a single act which jeopardizes the lives of two or more persons; for example, a bombing or arson. According to the defendant, the statute was not intended to encompass multiple murders arising out of the commission of a single felony. We disagree.

██ Since RCW Title 9A does not define "act", the ordinary and usual meaning must be attributed to the statutory term. *Warmington v. Department of Employment Security,* 12 Wn. App. 364, 368, 529 P.2d 1142 (1974). The *American Heritage Dictionary of the English Language* (1969) defines the word "act" as:

> the process of doing or performing something; an action . . . a deed . . . something that is done or performed.

Evidence presented at trial showed that the defendant entered the Woodses' home with intent to commit robbery. The defendant perpetrated the murders in furtherance of this intent. Certainly, the robbery itself was an "act" within the ordinary and usual meaning of that term, and the murders occurred as a result of that act. While we are aware of the rule that ambiguous penal statutes must be interpreted strictly against the State and liberally in favor of the accused, *State v. Lundell,* 7 Wn. App. 779, 781, 503 P.2d 774 (1972), the rule is inapplicable here because RCW 9A.32.045(6) is not ambiguous. Rather, the obvious intent of the formulators of RCW 9A.32.045 was to include the situation described here. Strict construction of a penal statute means only that sanctions must be confined to those matters clearly within the terms of the statute. It does not mean that a forced or narrow construction should

be applied to defeat the intent of the statute. *State v. Rinkes*, 49 Wn.2d 664, 667, 306 P.2d 205 (1957).

Nor are we convinced by the defendant's argument that RCW 9A.32.045(7)[4] constitutes an exclusive definition of those felony murders included in the definition of aggravated first–degree murder. Subsection (7) makes a *single* murder aggravated first–degree murder when it is committed either in furtherance of the crime of rape or kidnapping, *or* in immediate flight therefrom. Subsection (6), involved here, requires that there be more than one victim and that the murders occur as a result of any single act of the defendant. Thus, subsection (7) is at once broader and narrower than subsection (6), *i.e.*, it includes a *single* murder accomplished during the accused's *flight* from rape or kidnapping, but its application is limited to a murder arising out of those two offenses.[5] The intent was that a person who commits *any* murder in the course of committing rape or kidnapping should be guilty of aggravated first–degree murder, because of the serious nature of those offenses. However, subsection (6) was intended to include *multiple* murders occurring during the commission of other felonies. Therefore, we hold that the defendant was properly charged with first–degree aggravated murder.[6]

▮ Seventh, the defendant argues that the trial court erred in sentencing him to life imprisonment without possibility of parole. He reasons that RCW 9A.32.047[7] pro-

---

[4]RCW 9A.32.045(7) provides that a murder committed "in the course of or in furtherance of the crime of rape or kidnapping or in immediate flight therefrom" is aggravated first–degree murder.

[5]Subsection (7) of RCW 9A.32.045 has since been amended to include burglary, robbery, and arson.

[6]*State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), cited by the defendant, is distinguishable. There, the Nebraska statute with which the court was concerned differed materially from RCW 9A.32.045(6). The statute, section 29–2523(1)(f), RRS (1943), included, as an aggravating circumstance, cases where "the offender knowingly created a great risk of death to at least several people." The language of RCW 9A.32.045(6) is broader.

[7]RCW 9A.32.047 provides:

vides for such a sentence only if one of three specified events occurs: (1) the governor commutes the defendant's death sentence; (2) the United States Supreme Court declares the death penalty unconstitutional, or (3) the Washington Supreme Court declares the death penalty unconstitutional. Here, it was the trial judge who held the Washington death penalty unconstitutional. Therefore, the defendant contends that none of the three specified events occurred and that the trial court, in imposing the alternate sentence, infringed upon the legislature's power to prescribe punishments. *See Hendrix v. Seattle,* 76 Wn.2d 142, 157, 456 P.2d 696 (1969). We disagree.

The United States Supreme Court in *Woodson v. North Carolina,* 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976); and in *Roberts v. Louisiana,* 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001 (1976), struck down statutes such as RCW 9A.32.046 which had mandatory death penalties for certain crimes. The trial court, following these decisions, struck down the death penalty statute, RCW 9A.32.046, applicable to this case.[8] We do not construe RCW 9A.32-.047 to require that the Washington statute itself be held unconstitutional by the United States Supreme Court or our Supreme Court before the alternate sentencing provision would apply. RCW 9A.32.047 states only that the

---

"In the event that the governor commutes a death sentence or in the event that the death penalty is held to be unconstitutional by the United States supreme court or the supreme court of the state of Washington in any of the circumstances specified in RCW 9A.32.045, the penalty for aggravated murder in the first degree in those circumstances shall be imprisonment in the state penitentiary for life. A person sentenced to life imprisonment under this section shall not have that sentence suspended, deferred, or commuted by any judicial officer, and the board of prison terms and paroles shall never parole a prisoner or reduce the period of confinement nor release the convicted person as a result of any automatic good time calculation nor shall the department of social and health services permit the convicted person to participate in any work release or furlough program."

[8]RCW 9A.32.046 states:
"A person found guilty of aggravated murder in the first degree . . . shall be punished by the mandatory sentence of death."

death penalty must be declared unconstitutional. It does not refer to the *Washington death penalty*. Further, to require an appeal to our Washington Supreme Court on this issue after the United States Supreme Court has already settled the question would be a waste of judicial time and effort and involves a procedure never intended by the legislature.

Finally, the defendant asserts that the *mandatory* sentence of life imprisonment without possibility of parole violates the constitutional prohibition against cruel and unusual punishment.[9]

The test utilized in determining whether a punishment is cruel and unusual is whether, in view of contemporary standards of elemental decency, the punishment is of such disproportionate character to the offense as to shock the general conscience and violate principles of fundamental fairness. *State v. Gibson*, 16 Wn. App. 119, 125, 553 P.2d 131 (1976); *Coker v. Georgia*, 433 U.S. 584, 53 L. Ed. 2d 982, 97 S. Ct. 2861, 2865 (1977); and *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976).

Measuring the sentence of life imprisonment without parole against the crime for which the defendant was convicted, we find nothing disproportionate in the sentence. As the court noted in *Gregg v. Georgia, supra* at 183, retribution remains a societal goal. This sentence accomplishes that goal. Nor does the sentence offend basic notions of human dignity. The defendant may gain increased privileges and responsibilities within prison through good conduct, may participate in educational and vocational training, and retains the hope of an executive pardon.

The defendant further argues that the reasoning of the United States Supreme Court in *Woodson v. North*

---

[9]The eighth amendment to the United States Constitution reads:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

*Carolina, supra,* the case which held mandatory death penalties unconstitutional, is also applicable to mandatory sentences of life imprisonment without possibility of parole. We disagree. *Woodson* held that a shortcoming of mandatory death penalty statutes is their arbitrariness, *i.e.*, their failure to allow the jury the opportunity to consider the character and record of the individual defendant before imposing a sentence of death. However, the United States Supreme Court specifically predicated its ruling on the fact that the death penalty is qualitatively different from other punishments. In *Woodson v. North Carolina, supra* at 304, the court noted:

> While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in *capital cases* the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

(Italics ours.) *See also Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978). The courts of Louisiana and New Hampshire, in upholding mandatory life sentences without possibility of parole, have distinguished *Woodson* on this same basis. *State v. Farrow,* 386 A.2d 808 (N.H. 1978); *State v. Cook,* 345 So. 2d 29 (La. 1977).[10]

---

[10]*Workman v. Commonwealth,* 429 S.W.2d 374 (Ky. Ct. App. 1968), relied upon by the defendant, is distinguishable. In *Workman,* the sentence of life imprisonment without parole was found to be cruel and unusual punishment when applied to two 14–year–old boys convicted of forceable rape. The court found that the intent of the legislature in creating the sentence was to deal with dangerous and incorrigible individuals who would be a constant threat to society. The court further found that it is impossible to make a judgment that a 14–year–old who commits the crime of rape will remain incorrigible for the rest of his life. Here, the defendant's 18th birthday was only about 2 months away when he committed the murders. He was an adult when tried. In addition, the crime with which the instant defendant was charged was more serious than the crime charged in *Workman.* Under these facts, we cannot say that the sentence is cruel and unusual as applied to this defendant.

Affirmed.

MUNSON, C.J., and McINTURFF, J., concur.

Reconsideration denied December 21, 1978.

Review denied by Supreme Court May 4, 1979.