[No. 17146–1–I. Division One. April 27, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. GLENN LEE SLEMMER, *Appellant.*

*Rita J. Griffith* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Lynn S. Prunhuber, Deputy,* for respondent.

RINGOLD, J.—The defendant, Glenn Lee Slemmer, was found guilty by a jury of one count of first degree theft and two counts of securities fraud. He appeals the judgment and sentence imposed and raises several assignments of error. The State cross–appeals the suppression of a deposition. We affirm the judgment, but remand for a redetermi-

nation of the amount of restitution ordered.

Slemmer met a retired couple at his church in 1980, and they helped him move to Seattle. Slemmer told them that in Vancouver, British Columbia, he had invested $5,000 in stock options which increased in value to $50,000 in 1 year. On January 25, 1981, the couple and Slemmer formed a partnership named Growth Unlimited (G.U.) to invest in stock options. The couple, as an initial capital investment, supplied $25,000 and Slemmer supplied the expertise. The partnership agreement provided that all three were to make purchase and sale decisions, but Slemmer actually made all the decisions.

Slemmer set up an account for G.U. with a brokerage firm. Under the partnership agreement Slemmer was to inform the couple each week as to what trading had been done. He failed to inform them that by February 27, 1981, the G.U. account had lost $2,717.70. Had the couple known of these losses, they would not have made additional investments and would have withdrawn their funds. Slemmer continued to conceal losses from the couple and the couple continued to invest additional funds.

On August 26, 1981, Slemmer told the couple for the first time that they had lost money, but said it was only $10,000. G.U. had actually lost $77,348. On September 2, 1981, Slemmer and a broker that he had been using met with the couple and informed them that the G.U. account had only $15,000 left from a $105,000 investment. Slemmer stated, however, that he could recoup the losses with further investments. The couple, feeling they had little choice and based on Slemmer's promise, decided to leave the $15,000 in the G.U. account. Slemmer continued to lull the couple into believing they were doing well. The couple met with Slemmer on January 13, 1982, and he stated the G.U. account was down to $5,000, when only $62 remained.

While Slemmer was involved with G.U., he was also giving lectures to small groups about stock options. Several persons who attended his lectures decided to invest in stock options and have Slemmer advise them. They formed an

investment club called Profit Design Group (PDG).

As with G.U., Slemmer set up an account for PDG with a brokerage firm. Slemmer had control of the PDG account and could make decisions on which stock options to buy or sell. He was not authorized to withdraw money from the account for his own benefit. Nonetheless, Slemmer withdrew money from the PDG account to make payments on real estate he owned.

Slemmer made false representations to the members of PDG and lost all the money in their account. At a meeting between Slemmer and the PDG members on September 16, 1982, Slemmer revealed the losses and admitted he had lied and made improper withdrawals from PDG's account. One of the PDG members tape–recorded this meeting without Slemmer's knowledge.

The trial court granted Slemmer's motion to suppress the tape recording at trial, but over Slemmer's objection, permitted the PDG members to testify about the September 16, 1982, meeting.

TAPE–RECORDED MEETING

Slemmer contends that the meeting between him and the PDG members was tape–recorded in violation of RCW 9.73,[1] which protects against the unauthorized recording of private conversations. He argues that under *State v. Williams,* 94 Wn.2d 531, 543, 617 P.2d 1012, 24 A.L.R.4th 1191 (1980), witnesses should not be allowed to testify about statements which were recorded in violation of RCW 9.73. The State responds that the recorded meeting was not a

---

[1]RCW 9.73.030 provided in part:

"(1) Except as otherwise provided in this chapter, it shall be unlawful for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, or record any . . .

"(b) Private conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation."

RCW 9.73.050 provides in part:

"Any information obtained in violation of RCW 9.73.030 . . . shall be inadmissible in any civil or criminal case . . ."

private conversation as defined in RCW 9.73.030(1)(b); therefore, the recording was permissible as well as any testimony regarding the recording.

While RCW 9.73.030 prohibits the recording of *private conversations,* the statute does not define those terms. In the absence of a statutory definition the terms must be given their ordinary and usual meaning. *State v. Forrester,* 21 Wn. App. 855, 861, 587 P.2d 179 (1978). The courts have defined the word *private* in this context to mean:

> secret . . . intended only for the persons involved (a conversation) . . . holding a confidential relationship to something . . . a secret message: a private communication . . . secretly: not open or in public.

*Forrester,* at 861 (quoting *Webster's Third New International Dictionary* (1969)); *accord, State v. Bonilla,* 23 Wn. App. 869, 872, 598 P.2d 783 (1979).

"To determine whether or not a . . . conversation is private, the court must consider the intent or reasonable expectations of the participants as manifested by the facts and circumstances of each case." *Forrester,* at 861. The trial court found:

> The minutes of Profit Design Group which summarized their meetings were available to anyone, within or outside of Profit Design Group, and all of the participants of the September 16, 1982 meeting knew that.

Finding of fact 4.

> At the September 16, 1982 Profit Design Group meeting, Yvonne Tate took minutes on a large legal–sized yellow pad. Glenn Slemmer was seated four or five feet away from Yvonne Tate, and he knew she was taking minutes.

Finding of fact 5.

> All the participants in the September 16, 1982 meeting knew that the substance of their conversation at that meeting was available to outside people, but Glenn Slemmer did not know that a verbatim record of that meeting was being made.

Finding of fact 6.

Slemmer did not have a reasonable expectation of pri-

vacy in the meeting between himself and the PDG members. Slemmer was aware that one of the PDG members took minutes of the meeting. These minutes were part of the public business records of the group, which could be revealed by the members to any persons outside the group. Because the taped conversation was not private, it was not error to allow the witnesses to testify about the meeting. *See Forrester; Bonilla.* Likewise, the tape should not have been excluded from evidence.[2]

## EXPERT TESTIMONY

Sheryl Cain and James Bishop, both licensed securities traders, testified for the State. Cain testified that options trading was risky and that no more than 15 percent of a person's assets should be invested in options. Cain also testified that clients at her firm were provided risk disclosure statements when they traded in options. Bishop testified that prospective options clients were given a more thorough series of questions about their objectives and financial security than persons merely investing in securities or bonds. This testimony came in over an objection by defense counsel as to its relevance.

Slemmer contends that the testimony was not relevant because he was not a licensed security dealer.[3] He argues that the professional standards of a licensed dealer should not be applied to a lay person giving advice about stock picks.

Slemmer was charged with violating RCW 21.20.010 which states:

---

[2]The motions court had ruled that the tape of the meeting and any reference to the tape was inadmissible. On direct examination a state witness disclosed that the meeting had been taped. Slemmer moved for a mistrial. The trial court denied the motion for mistrial. The denial was not error, because the tape and any references to it were admissible evidence.

[3]Slemmer argues for the first time on appeal that the evidence should be excluded under ER 403 as misleading and confusing to the jury. Having failed to make this argument to the trial court, Slemmer cannot raise it on appeal. *State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986).

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

(1) To employ any device, scheme, or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

■ The trial court's decisions regarding relevancy of evidence should not be overturned on appeal absent manifest abuse of discretion. *State v. Mak*, 105 Wn.2d 692, 702, 718 P.2d 407, *cert. denied*, ___ U.S. ___, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986). Slemmer told the members of PDG that he had turned $20,000 in the G.U. account into $89,000 in 3 months.[4] He encouraged PDG members to make further investments with him by giving glowing reports. The testimony by the securities traders was relevant to show that Slemmer's representations were misleading. Slemmer's failure to discuss the risks and hazards of options trading, while focusing on the benefits that could be obtained, is evidence that Slemmer was acting contrary to RCW 21.20-.010(2). The trial court did not abuse its discretion by admitting Cain's and Bishop's statements regarding the risks in options trading.

ELEMENT OF INTENT TO PERMANENTLY DEPRIVE

Slemmer diverted money from the PDG account to make payments on his property. Based upon this activity, Slemmer was charged with violating RCW 9A.56.030(1)(a) and 9A.56.020(1)(a) and (b). RCW 9A.56.030(1)(a) provides that: "A person is guilty of theft in the first degree if he commits theft of: (a) Property or services which exceed(s) one thousand five hundred dollars in value . . ." RCW 9A.56.020(1)(a) and (b) provide:

---

[4]The G.U. account had actually lost $40,000 during that time.

(1) "Theft" means:

(a) To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him of such property or services; or

(b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him of such property or services . . .

RCW 9A.56.020(1)(a) includes both theft by taking and theft by embezzlement. *State v. Vargas,* 37 Wn. App. 780, 782, 683 P.2d 234 (1984). RCW 9A.56.020(1)(b) is theft by deception. *Vargas,* at 782. Only theft by taking requires an intent to permanently deprive. The State was proceeding under a theory of either theft by deception or theft by embezzlement; therefore, no instruction on intent to permanently deprive was given to the jury. Slemmer objected to the failure to instruct the jury that an intent to permanently deprive was an element of the crime charged.

"Embezzlement occurs where property that comes lawfully into the taker's possession is fraudulently or unlawfully appropriated by him." *State v. Gillespie,* 41 Wn. App. 640, 643, 705 P.2d 808 (1985). Slemmer was not authorized to withdraw money from the PDG account. Thus, he claims that the money did not lawfully come into his possession. Slemmer contends that the evidence demonstrates a theft by taking and not embezzlement. Thus, he argues the trial court erred by not instructing the jury that an intent to permanently deprive was required.

Former RCW 9A.56.010, applicable at the time of trial, defines the terms "wrongfully obtain" and "exert unauthorized control" used in RCW 9A.56.020(1)(a). The definition encompasses what was formerly embezzlement stating the meaning of those terms as:

(b) Having any property or services in one's possession, custody or control as . . . *agent* . . . or person authorized by agreement . . . to take or hold such possession, custody, or control, to secrete, withhold, or appropriate

the same to his own use or to the use of any person other than the true owner or person entitled thereto . . ." (Italics ours.) Former RCW 9A.56.010(7)(b); *State v. Dorman,* 30 Wn. App. 351, 354, 633 P.2d 1340 (1981).

Slemmer was PDG's agent. He was authorized by agreement to make investment decisions with the money in the PDG account. Slemmer was not authorized to withdraw money from the account for any other purpose than investing in stock options. Slemmer, however, used money from PDG's account to make payments on investment property he owned and to make his house payments.

The facts demonstrate embezzlement. Slemmer had control of PDG's account as their agent, and was authorized to control the account by agreement. Thus, when he appropriated the funds in the account to his own use he was acting contrary to RCW 9A.56.020(1)(a) as defined by RCW 9A.56.010(7)(b), the definition of embezzlement.

The crime of theft by embezzlement does not require a finding of intent to permanently deprive. *Vargas,* at 782. The trial court correctly refused to instruct the jury that such an element was required. *See Vargas; State v. Markham,* 40 Wn. App. 75, 86, 697 P.2d 263, *review denied,* 104 Wn.2d 1003 (1985).

## MERGER

Slemmer contends that the acts which constitute the securities fraud upon the members of PDG also enabled Slemmer to commit the theft. Thus Slemmer argues that the two counts should be merged.

The merger doctrine is of judicial origin and is designed to prevent an unnatural elevation of the "true" crime charged. *State v. Arnett,* 38 Wn. App. 527, 528, 686 P.2d 500 (1984). Although the term merger is used in different contexts, as applied here, it refers to a doctrine of statutory interpretation used to determine whether the Legislature intended to impose multiple punishments for a single act which violates several statutory provisions. *State v. Vladovic,* 99 Wn.2d 413, 419 n.2, 622 P.2d 853 (1983). Unlike

double jeopardy, it is not of constitutional magnitude. *See Vladovic; State v. Bonds,* 98 Wn.2d 1, 653 P.2d 1024 (1982), *cert. denied,* 464 U.S. 831, 78 L. Ed. 2d 112, 104 S. Ct. 111 (1983).

■ At trial, defense counsel argued strongly, for a different reason, that the theft count and the securities count were separate and distinct requiring separate proofs. Failing to raise the issue of merger at trial, Slemmer cannot now assert it on appeal. *See State v. Guloy,* 104 Wn.2d 412, 421, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986).

## EFFECTIVE ASSISTANCE OF COUNSEL

■ Slemmer contends that he was denied effective assistance of counsel. In his pro se supplemental brief he proffers eight reasons for this contention. Several of those reasons, however, are based upon facts not in the record. Slemmer has the burden to provide this court with an adequate record to review the issues he raises on appeal. *State v. Jackson,* 36 Wn. App. 510, 516, 676 P.2d 517, *aff'd,* 102 Wn.2d 689, 689 P.2d 76 (1984). This court's determination of Slemmer's claimed error of ineffective assistance of counsel must be made from a review of the record itself. *State v. King,* 24 Wn. App. 495, 498, 601 P.2d 982 (1979).

The standard of review of this type of claim was enunciated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) and adopted by our Supreme Court in *State v. Jeffries,* 105 Wn.2d 398, 418, 717 P.2d 722, *cert. denied,* ___ U.S. ___, 93 L. Ed. 2d 301, 107 S. Ct. 328 (1986). To establish ineffective assistance of counsel the defendant must first show that counsel's performance was deficient. Second, the defendant must show prejudice resulted from the counsel's poor performance. *Strickland,* at 688; *Jeffries,* at 418. "The reviewing court need not address both prongs of the test if the defendant makes an insufficient showing on one prong." *State v. Fredrick,* 45 Wn. App. 916, 923, 729 P.2d 56 (1986).

Slemmer first argues that his trial counsel was preoccupied with one technical argument at trial that proved unsuccessful and counsel's lack of effort on the rest of Slemmer's case prejudiced him. It should be noted that the trial court commended defense counsel on his excellent oral presentation and written brief regarding the defense theory that proved unsuccessful. "The constitution does not guarantee successful assistance of counsel." *State v. Garcia,* 45 Wn. App. 132, 140–41, 724 P.2d 412 (1986). In any event, there is no indication from a review of the record that defense counsel did not devote sufficient time to trial preparation. Counsel actively cross–examined witnesses and made lengthy arguments over objections to evidence.

Slemmer next argues that his trial counsel failed to present certain evidence and to impeach several witnesses. The record does not reflect that the witnesses could have been properly impeached as Slemmer claims. The record demonstrates defense counsel's performance was not outside the wide range of professionally competent assistance. The trial court commented at sentencing that Slemmer had received "good legal representation."

Slemmer has failed to meet his burden to demonstrate upon the record before this court that his trial counsel acted unreasonably in Slemmer's defense. Trial counsel has not been shown to have "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* at 687.

### RESTITUTION

The trial court entered an order deferring imposition of sentence for 20 years. One of the conditions was that Slemmer pay restitution pursuant to a separate order. The trial court required Slemmer to pay $117,000, of which $104,000 was to be paid to the members of G.U.

At trial Slemmer objected to $25,000 of this amount, arguing that the initial investment of $25,000 into the G.U. account was not based upon any misrepresentations. The State stipulated that Slemmer actually had made large

profits off stock options prior to the G.U. members' initial investment. On appeal, Slemmer contends that his restitution payments should be reduced by $25,000.

The State responds that Slemmer stated prior to any investments that the risks of options trading were "very little" and "quite diminished." The State mischaracterizes the testimony. The actual testimony of the G.U. members was as follows:

[PROSECUTOR] Q. What if anything did he tell you about the risks involved in options and this, again, is before you started?

[First G.U. MEMBER]: A. I can't remember. In all fairness, I think we are old enough to know that the bigger the gain, the bigger the risk, also, but we were convinced that Glenn knew how to do it.

Q. From what he told you, what kind of risk did you think you were running?

A. I would say very, very little.

. . .

[PROSECUTOR]: Q. Did he tell you anything about the risks of option investments?

[Second G.U. MEMBER]: A. Well, every, everything is a risk. It just seemed that his success rate overrode a lot of risk that we would be taking because of his track record.

Q. So, from what he told you, what was your impression of what the risks in options tradings were?

A. That they were quite diminished because of the way, of his knowledge and his experience in working with options.

The G.U. members did not say that Slemmer failed to inform them of the risks. Instead, they relied on his past truthful success record and believed that the risks were small. The initial investment in the G.U. account, therefore, was not the product of fraud.

Restitution ordered by the court is governed by RCW 9.94A.140 which provides in part that "The amount of restitution shall not exceed double the amount of the offender's gain or the victim's loss from the commission of the crime." "The objectives of allowing restitution as an alternative to imprisonment are to provide reparation to the

victims of crime and to prevent future offenses." *State v. Rogers,* 30 Wn. App. 653, 657, 638 P.2d 89 (1981). When the amount of restitution exceeds that proven at trial the trial court should enter findings as to the amount of loss suffered by the victims. *Rogers,* at 658–59.

The trial court's oral ruling reflects an intention to limit restitution to the actual losses incurred by the victims. The trial court, in response to Slemmer's argument, initially reduced the amount of restitution by $25,000. When the State objected, arguing that the initial investment was also induced by fraud, the trial court stated:

THE COURT: All right. This is what I'll do. I'll leave the figure just as it is, Mr. Reiman, [defense counsel] which would be [$]117,000 at this point. Upon later reflection, if it appears to the Court that your argument should be persuasive, you can always modify this sum.

On appeal, Slemmer argues that there were other sums that should not be included in the amount of restitution. The record does not disclose whether any of these sums are appropriate or not. The trial court should determine the amount of loss suffered by the victim, enter findings, and order an appropriate amount of restitution. *See Rogers,* at 658–59.

It is not necessary to decide the procedural or substantive issues relating to the State's cross appeal because we affirm the judgment and remand only for a redetermination of the appropriate amount of restitution.

SCHOLFIELD, C.J., and COLEMAN, J., concur.

Reconsideration denied June 5 and 17, 1987.