

2015 JUL 27 AM 11:25

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON,     )
           )    No. 71447-3-I
      Respondent,     )
           )    DIVISION ONE
   v.              )
           )
MORRIS TALAGA,       )    UNPUBLISHED OPINION
           )
      Appellant.      )    FILED: July 27, 2015

SPEARMAN, C.J. — In a trial for assault in the first degree, the court admitted evidence of statements Morris Talaga had posted on his Facebook account before the alleged assault. Talaga argues that the evidence should have been excluded as prior acts evidence under ER 404(b). In a statement of additional grounds, he also argues that the charging information was insufficient and the jury instructions failed to require unanimity as to which act constituted degree assault. Finding no error, we affirm.

## FACTS

Morris "Mo" Talaga was charged with one count of first degree assault arising from an attack on Montrae Gooden in the early hours of August 28, 2011. At trial, Talaga did not deny attacking Gooden, but argued that he had acted lawfully in self-defense. The jury convicted Talaga as charged on the following evidence.

No. 71447-3-I/2

On the evening of August 27, 2011, Gooden left his home in Renton, Washington to go out with his friend Leslie McCraney to a bar called Jimmy T's. The bar, located in Kent, Washington, had a reputation among local police as a "problem ba[r], probably the biggest problem on East Hill and the Valley combined." 5 Verbatim Report of Proceedings (VRP) at 42-43.[1] It was well known for frequent fights at closing time in the parking lot.

That night, Talaga was working as a security guard at the bar. When he got off work around 12:30 a.m., he went inside for some drinks with friends. He drank 3-4 cocktails before going out into the parking lot with friends.

Surveillance footage shows Gooden, McCraney, and Talaga standing in a loose group with other men in the center of the parking lot shortly after Gooden and McCraney's arrival. As Gooden and McCraney left the group at 1:50 a.m., Talaga circled and followed them until they finally walked out of range of the cameras. Neither McCraney nor Gooden appeared to follow Talaga. Talaga moved toward the bar entrance, waved his jacket in the air and lifted his shirt up, apparently challenging the other men.

As Talaga paced back and forth near the club entrance, Gooden and McCraney eventually reentered camera view some distance away in the parking lot. Talaga walked toward them. Soon Gooden and McCraney were surrounded by several men, including Talaga and two of his friends. As two of Talaga's

---

[1] The verbatim report of proceedings consists of eleven non-consecutively numbered volumes, which will be referred to as follows: 1VRP - (10/15/12, 10/29/13, 11/7/13, 11/27/13 and 1/10/14); 2VRP- (11/7/13); 3VRP- (11/12/13); 4VRP- (11/13/13); 5VRP- (11/14/13); 6VRP- (11/18/13); 7VRP- (11/19/13); 8VRP- (11/21/13); 9VRP- (11/25/13); 10VRP- (11/26/13); 11VRP- (11/27/13).

2

friends moved toward Gooden, Talaga began circling the group again. One of Talaga's friends punched Gooden and knocked him to the ground. As Gooden tried to raise his head, the assailant stood over him and punched him in the head again. Gooden raised his arms up as if to protect himself.

As Gooden lay on the ground, Talaga approached him, crouched down and punched Gooden twice in the head. The blow caused Gooden's head to roll forward. When McCraney approached to assist Gooden, Talaga also punched him. Talaga then returned his attention to Gooden who remained motionless on the ground. Talaga raised his right leg and stomped on Gooden's head. The force caused Gooden's body to roll forward. Talaga repeated this move three more times, causing Gooden's shoulders to move and his head to bounce off the pavement. Meanwhile, Talaga's friends continued attacking McCraney and another man present. As Gooden continued to lie motionless, Talaga drew back and punched Gooden's head a third, fourth, fifth and sixth time.

A security guard and another man in a dark shirt approached and gestured at Talaga to back away from Gooden. He did not. Instead, he walked around Gooden's motionless body, reached down, and punched him a final, seventh time, causing Gooden's head to bounce off the pavement. The security guard and the man in the dark shirt again motioned Talaga away from Gooden. This time he walked away, leaving Gooden lying motionless on the ground.

At trial, Talaga claimed that Gooden provoked the assault by "running off at the mouth," telling Talaga, "I will kick your ass." 9VRP at 53. Talaga stated that Gooden's words and conduct made him afraid for his safety, claiming that

Gooden had followed him throughout the parking lot as he attempted several times to walk away. Talaga testified, "I just wish [Gooden] would have just left the situation alone when I walked away and it wouldn't have went on as far as it did." 9VRP at 53; 61-62. Talaga claimed he engaged McCraney because he felt threatened. He turned his attention back to Gooden, who was prone on the ground, because, according to Talaga, he was still moving and still a threat. Talaga admitted striking Gooden several times with his fists and his feet, not waiting between blows to determine of Gooden could get up and again become a threat. When he no longer felt threatened by Gooden, Talaga left the parking lot and went home.

The State offered the testimony of an eyewitness, a Jimmy T's security guard, who heard Talaga yelling "I will beat your ass," 7VRP at 15-17; 9VRP at 60) and saw Talaga "'squaring up' with several men (7VRP at 16-17). The witness testified that Talaga's friends had "knocked out" Gooden, who "went to sleep. And that's when [Talaga] came up, gave it to him. [D]ude was already knocked out and . . . [Talaga] came and started giving it to him on the ground and [I] was trying to like, 'Dude, he is done,' you know, 'He is done,' you know, 'Stop.' [ .. . ] [Talaga] just ... ran up and super agro, and [was] just, like, kicking this guy in the face and punching him in the face while he was already on the ground." 7VRP at 19-21, 30-31. The witness repeatedly testified that Gooden was unconscious when Talaga was assaulting him, describing Gooden as "lights out," "asleep already," and "[o]nce dude hit the ground, he was -- there was nothing coming out of him." 7VRP at 20.

4

McRaney testified that neither he nor Gooden had said or done anything to instigate the attack by Talaga and the others.

And the jury heard testimony from three first responders, who each testified that they found Gooden on the ground, unconscious, with a large pool of blood under his head, and completely non-responsive to shaking or shouting. They noted his "agonal breathing," described as labored, snoring breath or gasping and grunting, the "kind of last breath you have before death." 5VRP at 15. And one witness testified that she had to be intubate Gooden at the scene in order to help him breathe.

Following the assault, Gooden spent almost three weeks in the Harborview Intensive Care Unit and was not discharged until September 16, 2011. He arrived with a Glasgow Coma Scale (GCS) score of 6, akin to a comatose person. Trauma surgeon Grant O'Keefe, Gooden's discharge physician, rendered six diagnoses for Gooden, including a nasal bone fracture and orbital fracture. Gooden also suffered a subdural hematoma (bleeding around the brain), a potentially permanent type of brain damage normally caused by a hard impact to the brain and accompanied by a fifty percent mortality rate. Gooden's other diagnoses were also typical of brain injury and hard blows to the head and neck, including inflammation of his lung from inhaling vomit, air pockets in his chest, and a bruise to his hippocampus, a deep part of the brain that directs the body's movements. Gooden was unable to breathe on his own for almost a week and a half and required intubation without which, O'Keefe testified,

he would have died. O'Keefe said there was a high chance that Gooden would never return to his previous level of functioning.

Gooden spent almost four additional weeks in inpatient rehabilitation. Dr. Peter Esselman, his attending physician, classified Gooden's brain injury as severe and noted his significant cognitive and physical impairments, typical of brain injury. Dr. Esselman agreed that Gooden would have died without treatment. Because of the severity of his injuries, Dr. Esselman anticipated that Gooden would have ongoing problems with higher-level attention, concentration, memory and cognition and was "confident" that any cognitive or physical deficits still present one year post-assault would be permanent. 9VRP at 18-20.

Heather Sevaaetasi, Gooden's partner, testified that after leaving rehabilitation, Gooden had ceased any further improvement entirely. Two years later, Gooden was so impaired that he could no longer take care of himself independently, work, cook, or watch his children, and was mentally the same age as his 15-year-old son. She had to assist him in bathing, shaving, and using the toilet.

Gooden testified that he was learning how to respell words and do math. He remained unable to work, drive, perform household tasks or play with his children, and could not help his children with their homework because "it's like I'm practicing myself, too." 7VRP at 67. He struggled with memory and balance. Because of the brain damage, he could not remember what had happened after leaving his house the night of August 27, 2011, recalling only waking up paralyzed in the hospital.

Police were unable to locate a suspect for several months following the assault. They had learned from bystanders at Jimmy T's bar that the assailant was a Samoan man with the nickname "Mo." 5VRP at 16. Based on this information, Gooden's partner, Sevaaetsai, began looking on Facebook for a Samoan man with the nickname "Mo." In November 2011, she discovered Talaga's Facebook page. At the time, the "Basic Information" section of Talaga's profile contained the following comment: "... just leave me alone & we got no problems, test me & u just might b on YouTube f[or] da most epic knockout. . . ." Ex. 16. Sevaaetsai forwarded this information to the Kent Police, who subsequently arrested Talaga.

## DISCUSSION

Talaga argues that the trial court erred when it admitted evidence of the comment on his Facebook page over his objection because, in his view, the evidence was improper propensity evidence under ER 404(b).[2] In response, the State argues that the comment was not a "prior act" subject to analysis under the rule. Instead, the State contends that the comment was a written expression of

---

[2] ER 404(b) provides:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

No. 71447-3-I/8

Talaga's state of mind, more appropriately analyzed as an "admission by party-opponent" under ER 801(d)(2).[3] We agree with the State.

Appellate courts review the interpretation of an evidentiary rule de novo. State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). However, the trial court's decision to admit or exclude evidence under a correctly interpreted rule is reviewed for an abuse of discretion. Id. "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons, i.e., if the court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." State v. Hudson, 150 Wn. App. 646, 652, 208 P.3d 1236 (2009) (citing State v. Lord, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)).

ER 404(b) governs the admissibility of "[e]vidence of other crimes, wrongs, or acts. . . ." Talaga does not argue that the comment on his Facebook page, which was not directed at any particular person, was either a "crime" or "wrong" within the meaning of the rule. And we conclude that it was not an "act" that must be analyzed under the rule.

---

[3] ER 801(d)(2) provides:

Admission by Party-Opponent. The statement is offered against a party and is (i) the party's own statement, in either an individual or a representative capacity or (ii) a statement of which the party has manifested an adoption or belief in its truth, or (iii) a statement by a person authorized by the party to make a statement concerning the subject, or (iv) a statement by the party's agent or servant acting within the scope of the authority to make the statement for the party, or (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

8

Although ER 404 does not define the term, we have recognized the plain and ordinary meaning of the word "act" as: "the process of doing or performing something; an action ... a deed ... something that is done or performed. State v. Forrester, 21 Wn. App. 855, 867, 587 P.2d 179 (1978); see also, State v. Kincaid, 103 Wn.2d 304, 314-15, 692 P.2d 823 (1985). Here, there can be no rational argument that the substance of the comment on Talaga's Facebook page amounted to a "process of doing" or "action." As such, it was not an act. Nor did it refer to a prior act, such as an assault or other episode of violence committed before the attack on Gooden. Accordingly, the evidence was not subject to analysis as a "prior act" under ER 404(b). Cf. State v. Brockob, 159 Wn.2d 311, 348-49, 150 P.3d 59 (2006) (in a prosecution for possession with intent to manufacture, defendant's confession to previously buying drugs analyzed under ER 404(b)).

The comment on Talaga's Facebook page is more properly analyzed under ER 801(a)(1), which defines "statement" as "an oral or written assertion," and ER 801(d)(2), which sets forth an exemption to the rule against hearsay for admissions by a party-opponent.

Because the Facebook comment was not prior acts evidence under ER 404(b) and was an admission by party opponent under ER 801(d)(2), not subject to the rule against hearsay, the trial court needed only to consider its relevance under ER 401 and potential for undue prejudice under ER 403 before admitting it. The trial court expressly found that the evidence was relevant because it was probative of Talaga's state of mind and intent at the time of the assault, both

9

disputed elements of Talaga's self-defense claim.[4] And it found by preponderance of the evidence that the evidence was not unduly prejudicial.[5] Because the trial court made the requisite findings based on facts supported by the record, we do not find admission of the evidence to be an abuse of discretion.

Next, in his statement of additional grounds, Talaga argues that the charging information was insufficient because it failed to include all essential elements of the crime. We disagree.

An accused has a right to be apprised with reasonable certainty of the nature of charges against that person in order to prepare an adequate defense. State v. Elliott, 114 Wn.2d 6, 13, 785 P.2d 440 (1990). But that right is not violated when the charging document fails to expressly charge accomplice liability. State v. McDonald, 138 Wn.2d 680, 688, 981 P.2d 443 (1999); State v. Davenport, 100 Wn.2d 757, 764-65, 675 P.2d 1213 (1984). It is constitutionally permissible to charge a person as a principal and convict him as an accomplice, as long as the court instructs the jury on accomplice liability. Davenport, 100 Wn.2d at 764-65.

---

[4] The State appropriately limited its use of the evidence to this purpose, noting during closing arguments that Talaga "told you about his intent to cause great bodily harm through his Facebook post. . . . This is being offered and was admitted for one purpose and one purpose only: To show the defendant's intent. To show the way the defendant thinks. . . ." 10VRP at 10.

[5] We note that, even if the Facebook comment were an "act" under ER 404(b), as Talaga suggests, evidence of the comment would likely still be admissible based on these findings, as the rule expressly contemplates admissibility of prior acts to prove intent, subject to "careful consideration of relevance and a realistic balancing of [the] probativeness [of the evidence] against its potential for prejudice." State v. Saltarelli, 98 Wn.2d 358, 365, 655 P.2d 697 (1982).

.

In this case, the charging information named only Talaga and did not mention accomplice liability. However, the jury was instructed on accomplice liability. Accordingly, Talaga's conviction was not unconstitutional on these grounds.

Talaga also asserts in his statement of additional grounds that the jury instruction failed to require unanimity as to which act constituted the first degree assault charged in this case. We disagree.

To convict a defendant of a crime, the jury must be unanimous that the defendant committed the criminal act. State v. Camarillo, 115 Wn.2d 60, 63, 794 P.2d 850     (1990). In cases where there is evidence of multiple acts of similar misconduct that relate to one charge against the defendant, the State is required to elect which act it is relying upon for a conviction. Id. If the State fails to make such an election, the court must instruct the jury that it must unanimously agree that the same underlying act has been proven beyond a reasonable doubt. Id. at 64. However, where the State presents evidence of multiple acts which indicate a "continuing course of conduct," neither an election nor a unanimity instruction is required. State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395 (1996) (citing State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989)).

In this case, the jury was instructed that, to convict on the first degree assault charge it must find:

> (1) That on or about the 28th day of August, 2011, the defendant assaulted Allen Montrae Gooden;
> (2) That the defendant acted with intent to inflict great bodily harm;
> (3) That the assault

(a) was committed by a force or means likely to produce great bodily harm or death; or
(b) resulted in the infliction of great bodily harm; and
(4) That this act occurred in the state of Washington.

If you find from the evidence that elements (1), (2) and (4), and either alternative element (3)(a) or (3)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (3)(a) or (3)(b) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

CP at 42. Notably, the State did not elect which of the several assaultive acts it alleged supported conviction and the jury was not given a unanimity instruction.

In State v. Villanueva-Gonzalez, 180 Wn.2d 975, 985, 329 P.3d 78, (2014), our Supreme Court noted five factors to be considered when determining whether multiple assaultive acts constitute one course of conduct. Those factors are:

— The length of time over which the assaultive acts took place,
— Whether the assaultive acts took place in the same location,
— The defendant's intent or motivation for the different assaultive acts,
— Whether the acts were uninterrupted or whether there were any intervening acts or events, and
— Whether there was an opportunity for the defendant to reconsider his or her actions.

Id.

In this case, the relevant assaultive acts took place rapidly over the course of only a few minutes. They all occurred in the same area of the Jimmy T's parking lot. And there is no evidence that Talaga's intent or motivation changed throughout the attack, that his acts were interrupted, or that he had meaningful opportunity to reconsider his actions. Accordingly, the assaultive acts here

12

constituted one course of conduct, for which no election or unanimity instruction was required.

Moreover, the overwhelming evidence in this case, which included numerous video images, the testimony of disinterested eyewitness, and Talaga's own testimony, established that Talaga committed each assaultive act alleged after Gooden was subdued on the ground and, if not unconscious already, nearing that state. Given this evidence, no rational juror could have a reasonable doubt as to whether each assaultive act alleged by the State established the crime of first degree assault beyond a reasonable doubt. Accordingly, even if the assaultive acts in this case did not constitute one course of conduct, any error in failing to instruct the jury on unanimity was harmless. Camarillo, 115 Wn.2d at 60.

Affirm.

WE CONCUR:

Spearman, C.J.

Appelwick, J.

Cox, J.